[Crim. No. 3366. In Bank.—February 18, 1931.]

THE PEOPLE, Respondent, v. AUGUST A. GINGELL, Appellant.

Charles J. Orbison and Orbison & Irwin for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

SHENK, J.—By information filed by the district attorney of Los Angeles County the defendant was charged with the murder, on February 21, 1930, of his wife, Vera Gingell, in the first count, and of Sigurd Bjorneby, in the second count. The jury returned a verdict of guilty of murder in the first degree on each count and in each verdict fixed the extreme penalty. From the judgment on each verdict and from the order denying his motion for a new trial the defendant presents this appeal.

The defendant and Vera Ramsey were married at Portland, Oregon, on December 24, 1919. In 1924 they moved to Los Angeles, where they resided together as husband and wife until June 5, 1926, when the defendant departed for Washington, D. C., where he had formerly lived. His wife followed him to that city in November of the same year, and they resided there for three years. In November, 1929, the wife left Washington, D. C., by train to New York, thence by boat to New Orleans, thence by train to Los Angeles. Because of lack of funds the defendant did not accompany his wife but proceeded later by stage, arriving in Los Angeles on January 18, 1930. He registered at the Hayward Hotel and telephoned his wife, who was living at 253 South Lake Street with Jean Chappelear, a friend under whom, as a department manager, the wife had worked

as a saleslady in a department store during her former residence at Los Angeles. According to the defendant's testimony he was without funds to rent an apartment for himself and wife, so he rented a room for himself at 1039 South Hope Street. He continued to live at that place until the night of the tragedy. He had known Jean Chappelear in the former years of his residence 'at Los Angeles and was dissatisfied with his wife's living with her. He had heard rumors that his wife was attending parties and going out with other men, whereupon he proceeded to spy upon the Chappelear apartment for the obvious purpose of satisfying himself of the actions of his wife and of the identity of her male company. His activities in this respect were carried on to such an extent that he was discovered several times watching his wife's apartment and was ordered by third parties to stay away from that vicinity. On one occasion he followed a man leaving the apartment to the latter's home and upon investigation found him to be Sigurd Bjorneby, the deceased, a man of foreign birth, thirty-four years of age, who had been employed on a whaling vessel but having his residence in San Francisco and who had been visiting his brother at Los Angeles from December 20, 1929, until the time of the homicides.

Although the defendant and his wife maintained separate habitations after their return to Los Angeles they saw each other frequently and cohabited as husband and wife. Their association was without strife except as to accusations on the part of the husband as to the wife's association with other men and going out on parties. There is some evidence of counter accusations of the same sort on the part of the wife. After consultation the two decided that the wife would move from Jean Chappelear's apartment. Accordingly they spent much of the day of February 19th looking for an apartment acceptable to the wife. They finally decided on a single apartment, No. 32, on the fourth floor at 1225 West 6th Street, where ten dollars was paid as rent for one week and a receipt for the money was issued to "Miss Gingell". Nothing was said at the time as to anyone else occupying the apartment with her. The next day, the 20th, the defendant helped his wife pack her personal belongings at Jean Chappelear's apartment and conveyed some of them by suitcase and traveling bag to the new place.

Later on in the day he borrowed an automobile from his employer, who conducted a market in Glendale, and by that means transported a wardrobe trunk to the new place, at which time he asked the apartment house manager for and was given the key to the apartment for the purpose of placing the trunk therein. When he was given this key he also stated to the landlady that he would probably bring some more things later in the evening and as it might be late he requested and received a key to the outside door. The landlady testified that at no time did either of them state that they were husband and wife. The defendant testified that the landlady was so informed. The wife registered as ''V. Gingell'' and notified the landlady early that evening that she would probably be called on the telephone by the name of Ramsey from the motion picture studio where she had been employed.

The defendant was working at a Glendale market as a meat cutter. He returned with the borrowed automobile to his work at Glendale about 4 o'clock on the afternoon of the 20th and worked until his regular quitting time at 7 o'clock, when by prior arrangement his wife called him on the telephone, at which time she told him that she was going on a party or at least to a show and then to a friend's house for a late dinner after the party. After the homicides the defendant stated that he suspected that his wife was not telling him the truth and determined to find out. He returned to his room on Hope Street, Los Angeles, had his supper, and armed himself with a 45-caliber United States army revolver which he had obtained many years before from an ex-marine and had since kept in his possession. He then walked to Sixth and Witmer Streets, where he called his wife's apartment on a drug-store telephone about 9:15 o'clock. The wife answered and told him that there were four in her apartment; that they were just ready to leave for a little house party and that they had decided not to go to a show. From then on he watched the apartment from a point on the opposite side of the street where he stationed himself behind a signboard and where he could see the light in the window of his wife's apartment. No one entered or left the apartment house after he commenced his watch whom he suspected of going to or leaving the apartment. At 11:45 the light of the

apartment was turned out, whereupon the defendant entered the apartment house, proceeded to the fourth floor and rapped on the door of apartment 32. After the second rap and no answer he unlocked and opened the door, turned on the light and saw his wife and Bjorneby in bed together. The defendant exclaimed " 'What's the idea' or something like that", whereupon the wife replied that it was none of his business. Bjorneby jumped out of bed and the defendant asked him to sit down, that defendant wanted to talk to his wife. The defendant testified that Bjorneby did not sit down but started toward him with a clenched fist and in a menacing manner and that he, the defendant, thereupon drew his gun and shot one shot into the air. Bjorneby then sat down on the bed. The defendant then asked his wife to dress and go with him to his room, whereupon the wife said: "Take that damn gun and get the hell out of here and leave us alone." He repeated his request to his wife to dress and join him and received a similar answer. Bjorneby rose again, so the defendant testified, and started toward him, and his wife jumped out of bed and started toward him, when "I then lost control of myself and started firing". Four shots were then fired, the first two into the body of Bjorneby, the second of which entered his head and killed him instantly. The other two shots entered the body of his wife, the second of which entered her head, rendered her unconscious and she fell to the floor. The defendant immediately left the apartment, returned to the street and walked to the corner of Sixth and Lucas Streets, looking for an officer. He then proceeded to Seventh and Lucas and entered the Commodore Drugstore where Officer Elmer Hoffman happened then to be. The defendant walked over to the officer, touched him on the arm and asked him to come outside. When the two arrived on the sidewalk the defendant handed the officer the gun, stated that he had committed a crime and wanted to surrender. The officer called the Georgia Street police station and shortly two officers from the detective bureau appeared in an automobile. At the suggestion of one of them the four went to the scene of the homicides, where they found the two bodies lying on the floor, the one dressed in her night clothes and the other in his underwear. Vera

Gingell was still unconscious but breathing. She was taken to a hospital but soon expired.

After ten or fifteen minutes spent in viewing the premises the defendant was taken to the Georgia Street station, where he was interrogated and his statements taken down in shorthand and later transcribed. He was again taken back to the apartment and further questioned. Photographs were taken at the scene of the homicide, after which the defendant was taken to Central police station, where he was further interrogated.

Taking up the points raised by the defendant in the order in which they are presented, it is first contended that the deputy district attorney in charge of the case was guilty of misconduct in his cross-examination of the defendant and in his argument to the jury.

In his statement to the officers on the night of the homicides, which statement was for the most part admitted in evidence, the defendant said that he did not want his wife to live in the vicinity of the Jean Chappelear apartment "on account of the gang she was running with". On cross-examination the deputy district attorney propounded the following question: "Can you tell us what you meant by 'the gang she was running with'?" An objection without stating the grounds therefor was interposed by the defendant's counsel and the court said "sustained". Then followed the question by the prosecutor, "Do you want to explain that?" to which objection was again interposed and a request made to the court to admonish the prosecutor for asking improper questions after the court had ruled the same objectionable. The prosecutor then said: "The witness has the right to explain anything," after which the court stated, "Objection sustained." It is this last remark of the prosecutor that is claimed to be misconduct. We find nothing objectionable in the remark, except perhaps a breach of decorum in interjecting it after the court had rightly or wrongly sustained the insufficient objection of the defendant's counsel. The objection might well have been overruled as the question on cross-examination had a legitimate bearing on the mental attitude of the defendant just prior to the homicides and the relationship of the defendant with his wife at that time. The defendant contended at the trial that his relationship with his wife was harmonious and free

from contention. In his statement before the trial he said that his wife accused him and that he had accused her of "cheating"; that she took it seriously a couple of times and that at one time she had attempted to commit suicide by taking poison. The prosecutor endeavored to cross-examine the defendant on his prior statements concerning these matters, by questions which appear from the record to have been appropriate. However, the defendant's objections thereto were sustained. Under the circumstances we cannot say that the course pursued by the prosecutor was misconduct.

Among the further specifications of misconduct is the following statement of the prosecutor in his opening argument: "Under the circumstances I don't see how it can be contended that this is anything but a first degree murder, not one first degree murder, but two first degree murders. We know the law that for one murder a man may be given the extreme penalty. At one time not long ago the law said that the jury had to find mitigating circumstances or it was their duty to impose the death penalty. The law knows that jurors frequently hesitate to do that and now it makes it optional with the jury. If the jury wishes, they may impose for one murder the death penalty or life. The defendant cannot serve two life terms in the penitentiary, and maybe a life term doesn't mean a life term either; maybe it means a very few years." On objection and request for admonition the court said, "Sustained. The jury is instructed to disregard that last statement of counsel." It may be assumed and declared that the statement referred to had no proper place in the argument, but the incident falls far short, considering the whole record, of requiring the reversal of the judgments. (See *People* v. *Reilly*, 208 Cal. 385 [281 Pac. 606].)

In his closing argument the prosecutor stated: "I wish the cold lips of Vera Gingell could tell you her story. I wish she could tell you of the infidelity of the defendant in this case. He silenced her lips. He tells his story. Could anyone doubt that he lied from the witness stand? When a witness is false in one part of his testimony, it is all to be distrusted. Counsel argued that there was a letter that I should have offered to the jury. He knows that the court read the letter and ruled it was immaterial. If

it is immaterial, the State can't offer it and the defense can't offer it. . . . Perhaps I know what Vera Gingell would testify to if she were here to go on the witness stand; perhaps I know that if Vera Gingell were here to testify that it would be of no value to the defendant in this case. Counsel knows we can't put in such a thing; counsel knows that we can't put in her statements before that time. He says, why didn't I put that immaterial letter in evidence. The court ruled that that letter had nothing to do with the case."

Counsel for the defendant interposed an objection to the foregoing statement on the ground that it was not a correct statement of the law and requested that the jury be so instructed. In ruling upon the objection the court said: "The jury will receive the law from the court and not take any statement of counsel as the law in this case, except in so far as that statement may coincide with the law as given to you by the court," and the court further and at length admonished the jury to disregard statements made by counsel for both parties with reference to the letter. There had been during the course of the trial a sharp controversy between counsel as to the existence and contents of a letter written by the defendant to his wife before the tragedy. This letter was in the hands of the district attorney and its production was called for by the defendant. After considerable maneuvering the court called for the letter and it was produced for the inspection of the court. Its introduction in evidence was refused apparently on the ground that it contained self-serving declarations. The letter is not set forth in the record so we are in the dark as to its contents and may not therefore rule upon its admissibility. Evidently counsel for the defendant in his argument, which is not in the record, commented on this letter and criticised the prosecutor for not producing it. Undoubtedly the reference to this letter by defense counsel provoked the reply of the prosecutor. There is no other reasonable explanation for it and none has been suggested. At any rate, the court sustained the objection and admonished the jury at length not to consider the statement of the prosecutor.

In reply to the argument of defense counsel advancing the honesty and rectitude of the defendant's char-

acter the prosecutor said: "He (counsel for the defendant) leaves out the elements that could come from the mouth of Vera Gingell and Sigurd Bjorneby. He talks about the lecherous hands of Sigurd Bjorneby. I wonder how many times the hands of this defendant had been engaged in a similar enterprise?" Objection to this argument was sustained and the jury was instructed that "such statement is not evidence in the case and it is not to be considered by you for any purpose in reaching your verdict. Such statement is to be as though you had never heard it". It is urged that the reference to what Vera Gingell would testify to and as to what could be shown as to the defendant's conduct toward his wife if she were alive, was especially reprehensible because, so the defense claims, there was no evidence as to mutual unfaithful conduct. In the statement taken by the officers the following questions were asked of the defendant and answers given as follows: "Q. You were both cheating? A. We were accusing each other. Q. You had accused her and she accused you? A. Yes. Q. Did it ever get serious? A. A little trouble; every family has a little trouble. Q. Was she cheating on you and you cheating on her? A. Both a little bit." It is true that when the original statement made to the officers was offered in evidence objection to the foregoing questions and answers was sustained; but the prosecution was permitted to use them for purposes of cross-examination and when the defendant was asked if those questions were asked and the answers so made the defendant stated that he "did not remember". On this state of the record we find no misconduct in the comment made thereon sufficient to justify a reversal.

█ Again the prosecutor in his closing argument stated: "It is a matter of common knowledge and principle that there are more murders committed annually in America than any civilized nation on the globe. It is also a matter of common knowledge that the murder wave is on the increase in America. There are various reasons ascribed therefor. One is the looseness of the law. Another is lack of efficiency in the prosecution on the part of the officers of the law. Third, and last, is the reluctance and hesitancy upon the part of the jurors to properly act in enforcing the law." It has been held in many cases that the range

of discussion, illustration and argumentation is very wide and that matters of common knowledge may be referred to and allusion may be made to the prevalence of crime and the duty of the jury. (*People* v. *Burke,* 18 Cal. App. 72, 102 [122 Pac. 435], and cases there cited.) Furthermore no objection to this statement was interposed.

It is expressly not contended by counsel for the defendant that any one of his specifications of misconduct standing by itself would be reversible error in the light of the court's admonitions, but it is asserted that taken together they should prompt the conclusion that the defendant did not have a fair trial. An inspection of the rather voluminous record discloses that counsel have singled out what might, disassociated from the context and associated arguments, be stressed as an overstepping of the bounds by the prosecution. But we are not convinced that singly or collectively they rise to the importance urged by earnest counsel in that behalf.

It is next contended that the court erred in giving certain instructions and in refusing to give certain other instructions proposed by the defendant. The court charged the jury generally and at length on the law of homicide, setting forth therein the definitions of murder of the first degree, murder of the second degree, manslaughter and self-defense and called attention to the distinctions to be drawn in fixing the degree of the crime, if a verdict of guilty should be found. In these general instructions was included the following: "If the accused was engaged in the performance of an unlawful act, and if the deceased attempted in a lawful manner to prevent the performance of such unlawful act, and if, while so endeavoring to prevent the same, the defendant in anger, and solely for the purpose of revenge, or to enable him to carry out his unlawful design, so interfered with by said deceased, attacked the latter with a deadly weapon, intending to kill said deceased, and did, under such circumstances, carry such intention into execution, the fact that defendant was in a passion would not mitigate or excuse such homicide, but the crime committed would in such case be murder in the first degree. It is not less murder because the act is done suddenly after the intent to commit the homicide is formed. It is sufficient that

the malicious intention precedes and accompanies the act of homicide.''

The foregoing portion of the general instruction is objected to, not because it does not state the law correctly, but because, it is contended, there are no facts in the case to which it could be made applicable. It is perhaps debatable whether such facts do or do not exist in the record. The prosecution's case was tried on the theory that the deceased wife had refused to live with her husband and that she lived separately for that reason. There was evidence from the mouth of the defendant himself to support an argument on that theory. He stated before the trial that when his wife left Washington, D. C., he feared she would not live with him again. At the trial he testified that a permanent separation was never contemplated and that they lived apart only because he was not financially able to provide a place suitable to the wife for both to live. There was also evidence to support the conclusion that the defendant obtained the key to her apartment without the wife's knowledge and in order that he might enter her apartment unbeknown to her. The wife had worked temporarily at a moving picture studio and the evidence is quite clear that she intended to continue in this work under her maiden name and that this was one of the reasons why she desired to live apart from her husband. But, assuming that the defendant had a legal right to enter his wife's apartment at any time, we are unable to conclude that he was prejudiced by this portion of a lengthy instruction which in its entirety correctly sets forth the law of homicide and the evident purpose of which was to call attention to the distinctions which the jury should draw in considering the evidence and in fixing the degree of the crime. (See *People* v. *Matthew,* 194 Cal. 273, 283 [228 Pac. 424]; *People* v. *Quimby;* 6 Cal. App. 482 [92 Pac. 493].)

The defendant further complains of the refusal of the court to give three certain instructions relating to the circumstances under which the homicides might be found to be manslaughter. It is unnecessary to set them forth in full. It was sought thereby to have the jury instructed that the sight of adultery committed by defendant's wife may be provocation which will justify that heat of passion sufficient to reduce the crime to manslaughter, ''pro-

vided the knowledge of the adultery of the wife is so recent as to preclude the idea of cooling time or premeditation and provided further that the defendant at the time of the commission of the alleged homicides was acting under the influence of passion aroused by the sight of his wife's infidelity''. These instructions were ''refused except as given in other instructions''. The other instructions on the subject were the following: ''The court instructs the jury that, although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation, if any, to consider in connection with all the facts and circumstances in evidence in the case, the state of mind of the defendant and the alleged provocation therefor, and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law and so, in this case, you will consider all the facts and circumstances in evidence in determining the condition of defendant's mind at the time of the alleged killing and the adequacy of the cause, if any, producing such condition. . . . The court instructs the jury that if in this case you do not believe from the evidence to a moral certainty and beyond a reasonable doubt, that the defendant is guilty of murder as defined in these instructions, but you do believe from the evidence to a moral certainty and beyond a reasonable doubt, that on or about the 20th day of February, 1930, without authority of law and without a premeditated design to effect the death of Vera Gingell and Sigurd Bjorneby, or either of them, while in the heat of passion caused by a provocation apparently sufficient to excite uncontrollable passion in the mind of the defendant, such as would render him incapable of cool reflection [the defendant did] shoot and discharge leaden bullets into the bodies of Vera Gingell and Sigurd Bjorneby, or either of them, from a loaded pistol, and then and thereby inflicted wounds upon the bodies of said Vera Gingell and said Sigurd Bjorneby, or either of them, from the effects of which either of them died, then it will be your duty to acquit the defendant on the charge of murder, either in

the first or second degree, and to find him guilty of the lesser degree of crime, to-wit: manslaughter.''

It is contended that nowhere in the instructions given is there any instruction or suggestion that the adultery of the wife suddenly discovered might be considered by the jury as a provocation for the deed or an extenuating circumstance to be considered by the jury in fixing the degree of the crime. To this we cannot agree. On the contrary, the instructions given would seem to have been more favorable to the defendant than the refused instructions in this respect. The refused instructions stressed the recent knowledge and sudden discovery of the adultery of the wife, resulting in the immediate resentment, anger and passion sufficient to relieve the defendant of the crime of murder; whereas, the instructions given did not stress the recent knowledge and sudden discovery but more generally directed a verdict of manslaughter instead of murder in the event that the homicide was found to be without premeditated design and while the defendant was acting ''in the heat of passion caused by a provocation apparently sufficient to excite uncontrollable passion in the mind of defendant such as would render him incapable of cool reflection''.

██ Another instruction was refused and of which the defendant complains. This instruction, in the first portion thereof, treated of the reasonable time which the law allows for the subsidence of the anger aroused by the sudden provocation before the offense will be removed from the realm of manslaughter, and thus far it was unobjectionable and properly stated the law; but the instruction went on to say: ''In applying this test all circumstances attending the homicides are to be taken into consideration, including the nature and extent of the provocation, the physical and mental condition of the defendant, his condition in life and peculiar situation at the time of the homicides, his education and his habits and his conduct and manner and conversation throughout the altercation.'' We think the foregoing quoted portion of the instruction was unsound and the entire instruction was therefore properly refused. The test was not the condition in life, education, habits and conduct of this particular defendant, but rather the ''cooling time'' to be considered was the time within which an ordinarily reasonable man would cool under like circumstances.

A similar instruction was properly condemned in *People* v. *Golsh,* 63 Cal. App. 609, 616 [219 Pac. 456].

■ The defendant insists that undue advantage was taken of him in his interrogation by the officers after his arrest and therefore that his statement was inadmissible in evidence. We find nothing in the conduct of the officers that is subject to just criticism. True, he was questioned at intervals until nearly dawn of the morning after the tragedy, but that alone is not sufficient to render his statement inadmissible. A confession was not wrung from him. In fact, immediately after the shooting, he hunted out an officer, surrendered his firearm and himself with the voluntary statement that he had committed a crime.

■ Finally it is contended that, on the record, this court should reduce the degree of the crime from murder of the first degree to murder of the second degree or manslaughter. This contention would be entitled to favorable consideration if the record disclosed that the defendant, without previous warning, had discovered his wife in the adulterous embrace of her paramour, and in the heat of the anger and passion thereby engendered had slain them on the spot, without premeditation or design. But the record does not bear that interpretation. In the first place it shows beyond dispute the defendant's suspicions of the infidelity of his wife. He had shadowed her apartment in an endeavor to observe her conduct and learn the identity of her men company. He had discovered by his own means the identity of Bjorneby as at least one of his wife's associates.

There is also documentary evidence of premeditation and design. A week or so before the killing the defendant wrote a letter to his father-in-law as follows:

"My dear Dad Ramsey:—After you have read this you will understand—I loved Vera too much to let her go on as she was—it was just another case of Birdie guess you understand even though it may be hard for you to believe tis true and I do too know you would rather see her where she is than doing such a wrong in the world—if I hadn't thought so much of Vera this would never happened but My God and Maker knows she drove me crazy night after night out with other men and all night too—thats why she would not live with me—I do hope you will

pull yourself together now and dont take this too hard as it was the only thing to do and I have told her it would lead to this.

"Your son in Law

"Gus."

The foregoing letter was not mailed but was found in the defendant's possession after the homicides. At the time of his arrest he handed to officer Hoffman a letter addressed to Ray Ramsey, his brother-in-law, reading as follows:

"Dear Ray Ramsey:

"Well Ray here is the worse. It had to be. I have cornered Vera and a Mr. Bjorneby in her apartment as the law found them only knocked out. Vera has been doing this thing for the past five years and God my judge knows I did all in my power to make her stop it but just like Birdie, there was no stopping, and I know you all would rather see her where she is than continue to do this thing. I told her I would give her up to a good man if she would do the right thing in this world, but she would rather do as she was, so forgive me and thank me through your prayers as I did the only right thing.

"Gus."

The defendant stated to the officers after his arrest that he wrote the letter to his brother-in-law before the night in question. At the trial he testified that he wrote it on the brick wall of the Good Samaritan Hospital which was near by and after the homicides had taken place. The jury had the right to believe, as they must have felt compelled to believe, that this letter was written before the homicides. It would seem to be entirely beyond belief that after the tragic moments of the shooting affair, and his immediate departure to hunt an officer and surrender himself, the defendant would or could stop and pen this letter on the brick sidewall of a building. On the other hand, this letter is in the same tenor as the one addressed to the father-in-law, admittedly written before the tragedy. Both of these letters evidence a deliberate purpose to relate the past event of the shooting of the deceased wife, but which was to take place after they were written. The second letter was unquestionably intended to impart information as to the kill-

ing of both the wife and her paramour. The defendant sought to explain them by stating that they referred solely to his own contemplated self-destruction, but they cannot be so interpreted. On no possible theory can it be said that they refer to the fact of his suicide. On the contrary, both refer to the past act of homicide which had not yet taken place. This we feel impelled to conclude is conclusive evidence of the prior intent and premeditation which classifies the homicides as murder of the first degree. It was the province of the jury, under the evidence, to fix the degree of the crime, and the application to reduce the degree must be denied.

Other minor points made by the defendant have been considered and are found to be without merit.

The judgments and orders are and each of them is affirmed.

Richards, J., Seawell, J., Waste, C. J., Curtis, J., Langdon, J., and Preston, J., concurred.

Rehearing denied.