[Crim. No. 4442.   In Bank.   Sept. 28, 1943.]

THE PEOPLE, Respondent, v. COURTNEY FRED ROGERS, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Eugene M. Elson, Deputy Attorney General, for Respondent.

EDMONDS, J.—Courtney Fred Rogers is the son of Courtney Commodore Rogers and Lilly Rogers. His mother died in February, 1941. Ten months later his father was asphyxiated in a fire which destroyed the house in which they were living. Following a trial upon an information which accused the son in Count I of the murder of his mother, in Count II with the murder of his father, and in Count III with arson, a jury returned verdicts finding him guilty upon each charge. The issues raised by his pleas of not guilty by reason of insanity were then tried with the result that he was found to have been sane at the time of the commission of each of the offenses named in the information. As the jury determined that each homicide was murder in the first degree and included no recommendation in its verdicts, judgment was pronounced sentencing him to death upon those counts and to the state prison for the term prescribed by law upon the conviction of arson.

The appellant, 24 years of age, lived with his mother and father in a modest home on the east side of Los Angeles. An illness had prevented his graduation from high school with his class, but he took a correspondence course and, in 1938, received a diploma. His musical education commenced when he was a young child. He started studying the pipe organ at Polytechnic Evening High School, and later with a professional organist. His custom for years had been to practice on the pipe organ at one of the Los Angeles churches

three afternoons each week. His mother usually went with him, and sat in the back of the church; afterward they customarily did the marketing or shopping or sought some entertainment. There is much evidence of a deep bond of affection between them.

Apparently during recent years there was little in common between the mother and father. The principal cause of this estrangement was the drinking habits of the husband, and Mrs. Rogers and the son were drawn closely together by her unhappiness.

As an unmarried young man within the draft age, for several months before the mother's death the appellant was expecting to be called for military service and his prospective leaving was evidently a matter of considerable concern to both her and the father. Because of his musical ability, young Rogers expected to serve in a band.

Except for several confessions which, the People assert, were made by the appellant following his arrest, the evidence concerning the deaths of Mr. and Mrs. Rogers shows the following facts:

Early in January, 1941, Mrs. Rogers fainted and fell. Thereafter she complained of an injury to her back and leg. She found walking was painful and avoided doing much of it. Courtney took care of her and did most of the household work. She was treated by a chiropractor, but on February 2d, Dr. Offenberg, a physician, was called. He advised that an X-ray should be taken and prescribed a sedative, directing that a 1½ grain capsule of it be taken at bedtime. Such a dose, he testified, is not a sleep producer but it makes an ordinary person feel more comfortable bodily.

Three days later, the appellant called on the physician and told him that his mother still had a good deal of pain. Dr. Offenberg again advised an X-ray and prescribed another sedative. The prescription called for 1½ grain capsules, one to be taken nightly. Dr. Offenberg testified that up to 20 grains may be taken in any 24 hours without harm.

Two days after the second sedative was obtained, Courtney and his father brought Mrs. Rogers to Dr. Offenberg's office and treatment by confinement to bed for the majority of the time during three or four weeks, with traction on the leg, was prescribed. Testifying concerning that visit, Dr.

Offenberg said, ''She had been ill for a period of three to four weeks prior to this time and she didn't like the idea very much of being confined to bed . . . but she did agree to it.'' At this time Mrs. Rogers seems to have indulged in an hysterical outburst and to have talked of taking her own life.

The traction apparatus was apparently constructed with considerable care by the father with the help of Courtney and neighbors. It consisted of a ''pulley with a weight attached to the end of a rope . . . and the other attached to the patient's leg and the rope run over a pulley into the bed.'' A mass of gauze and adhesive tape was made into a collar-like device to go around the ankle. To secure the tension, Mrs. Rogers would back herself up in bed so that she was pulling against the weights, and when she secured as much tension as she wanted she would lie there in bed and leave the device on as long as she felt she could stand it. When disengaged from the ankle, the rope remained under the covers of the bed, ready for instant use, and all the while attached to the weight at the base of the bed.

Although the physician instructed Mrs. Rogers to remain in bed except to go to the bathroom, she continued to be up and around the house a good deal. She was able to get in and out of bed unassisted, although she usually had some aid. Mrs. Offredo, who worked in the Rogers house at times, told the jury that Mrs. Rogers ''got up from the bed and she sat by the side of me in the kitchen and helped me wash the dish and put it away. . . . She would get up sometimes, not all the time.'' On the day before her death, Mrs. Rogers was up and about the house and took a bath by herself.

It was about four o'clock in the afternoon of February 10th that the sheriff's office received a call for assistance. Undoubtedly the telephone message came from Rogers, Sr. An officer responded. He found Mrs. Rogers in bed lying on her side with a wad of cotton ''right next to her nose.'' The cotton smelled of chloroform. An empty box which had contained the capsules enclosing the sedative last prescribed was on a bedside table. On the same table was an empty chloroform bottle. The odor of chloroform was strong in the room.

Mrs. Gesselman, a neighbor, who came in almost at once, testified that Mr. Rogers told her ''he found a piece of cot-

ton in the mother's hand." But the officer who first arrived testified that "Mrs. Rogers was lying on her right side. She was covered up to her armpits. Her left hand was extended and her right arm across her breasts, apparently dead." He said there was a little gas jet in the corner of the bedroom which he tested, ascertaining that the gas was turned off under the house. According to Dr. Offenberg, who reached the house later than the officer, the odor of chloroform was strong in the bedroom and he also detected the odor of illuminating gas. But when reminded of his own testimony at the preliminary hearing he admitted that he had then said: "The only thing I could detect was the chloroform." To further questions he stated, "The odor of the gas was apparently stronger throughout the house and not in the bedroom."

Dr. Offenberg made no examination of the body. He said it was partially covered with a blanket but that the traction apparatus was in place. "I don't recall by what means the rope was attached to the leg, but it would probably be by a piece of bandage." Two of the officers did not notice the traction device at all; another officer testified he saw the device at the foot of the bed but he did not know whether it was attached, adding, "The covers were not disturbed while I was there." And mortuary attendants who came for the body had no recollection of removing any sort of apparatus from it.

The appellant was not at home when the officers arrived but returned about midnight. Neighbors were there with his father. As related by them, young Rogers was smiling when he came in. But his face changed immediately, one of them said, when he was told that his mother was dead. Apparently there was a momentary silence. Courtney then sat down by his father on the sofa and "they started to talk." Mr. Rogers told the son that when he reached home the windows of the bedroom were closed and, as he entered it from the hall, there was a pillow against the door on the inside; that he had found the empty chloroform bottle on the stand and an open gas jet near her bed. According to Courtney, the neighbors left "and just after that my father and I were there alone in the house and he and I talked over what had happened and then my father asked me to go over to Mrs. Offredo's house and ask her and Mrs. Gesselman to come back."

Mr. Rogers then asked them not to mention to anyone the fact that Mrs. Rogers had committed suicide.

The autopsy surgeon determined that the cause of death was asphyxia from inhalation of illuminating gas, but he also found an odor of chloroform on the body. According to the funeral director, it is easy to embalm the body of a person who has died from the use of chloroform. On the contrary, "a person that dies from asphyxiation . . . is a hard case to embalm." The body of Mrs. Rogers was embalmed before the autopsy in a normal time with no difficulty. And the witness explained that, although there is a definite tinge to the skin following death from some gases, there was no discoloration of Mrs. Rogers' body.

It is apparent that Mrs. Rogers was a woman who frequently spoke of taking her own life and who regarded suicide as a likely means of escape if she should be beset with certain difficulties. She said to one friend, before her illness, that "if she ever was sick and didn't see any way of getting better that she would take a little 'black bottle.'" With respect to Courtney's going into the Army, the same neighbor testified, Mrs. Rogers told her that "if they took him away from her that she couldn't go on alone." She also discussed suicide with another friend, "not in those words perhaps but in substance," and concluded her remarks by saying, " 'If they take Courtney I am through.'"

Two deputies sheriff on patrol duty about four o'clock in the morning of October 25th, smelled smoke. Investigation showed that it was coming from the eaves of the Rogers' house. After summoning fire apparatus they broke in the front door. There was an immediate explosion and flash in the front room. The force of the explosion was so great that it threw the officers across the porch and out on the lawn. They returned to the house and, with firemen, endeavored to go through it in aid of anyone who might be there. The house was in darkness, and the smoke so dense that only by groping their way along the floor were they able to go through it. After great danger to themselves, they found Rogers, Sr., lying on the bathroom floor unconscious. With the aid of firemen they carried him out. He died shortly afterward in a hospital. The cause of death, as ascertained by an autopsy, was asphyxiation, with disease of the liver and acute alcoholism as contributing factors.

Battalion Chief Keyes estimated that the house burned for approximately 20 minutes and he classified it "as a fire, not from a natural origin." But he did not "detect any odor of gas" nor did he discover "anything about petcocks or any gas outlets of any sort being turned on." He said that "while the investigation was going on, after the sheriffs had arrived," he noted that the pilot light was on in the big furnace. But another fireman said that, in the bedroom which was occupied by Rogers, Sr., he found the gas petcock open.

An examination of the house disclosed that fires had been set in five different locations, one being in the closet of the bedroom occupied by Rogers, Sr. This one was of no consequence. The second fire began in a closet in the hall and only scorched some of the wood work. Two fires were lighted in the dining room. One of them caused considerable damage while the other did not get beyond the charring stage. The fifth fire, which commenced in the bedroom occupied by the son, gained the most headway. Investigating officers testified that they found three partially burned candles on the premises: one candle in the father's clothes closet where some newspapers and stuff were scattered around the bags and suitcases"; a second candle underneath the bottom shelf in the hall closet; and a third one, on the lawn.

Chief Keyes was asked: "When a door or window is opened onto a condition where fire has been going on in a closure such as that house presented to you there on that day, and there has been a fire going on, is there ever any sort of an explosion occurs?" His reply was, "Yes. That is gases that are formed from the hot materials in the room which have had insufficient oxygen to support combustion. The opening of a door or a window or the admittance of air with sufficient oxygen causes a flash which would be called a back-draft."

It appears that on several occasions during the months that followed his wife's death, Rogers, Sr., had spoken of taking his own life. Two months after it occurred, a neighbor testified, he said "He had nothing to live for only the boy . . . he called Courtney 'the kid' all the time . . . and he said that if it was not for him he would have the cat chloroformed and he would end it all." At another time he told her: " 'Don't be surprised, Mrs. Gesselman, if you read

of old man Rogers killing himself.' '' According to her testimony, he mentioned this to her several times.

Another neighbor testified that Mr. Rogers was very despondent from the time of Mrs. Rogers' death. He often came over to her house and "cried a long time. He would cry every day when he would talk of [her]. He would get over it, but as soon as you would mention his wife's name he started to cry again."

The evening of the day Rogers died, his son appeared at the sheriff's office, saying he had just read a newspaper account of the fire in which officers were reported to be searching for the son of the victim. He was questioned for a period of approximately five hours by the officers who had the case under investigation. The officers pointed out to him the locations where the candles had been found and other facts concerning the fire. His statement, which was taken by a stenographer, included an account of a quarrel with his father shortly before the fire occurred.

Courtney said he returned home around 11:30 p. m. and listened to the radio. The father arrived about two hours later and appeared to be intoxicated. According to the statement, Courtney told the officers that his father "sat down in the sofa beside me and said he wanted to talk over some things with me. . . . He wanted to know what was going to be done with the house. . . . He wanted to know if I would sign over a joint tenancy to him . . . or give him power of attorney. I told him I wouldn't do it, and that is where the quarrel started. He was very belligerent."

Title to the house which had been the family home for nineteen years stood in the names of Mrs. Rogers and the son as joint tenants but since her death he had taken no steps to terminate that tenancy. Unquestionably the father's concern over it was occasioned by the fact that young Rogers was under orders to appear the following Monday morning for induction into the United States Army.

In response to frequent questions, the appellant told the officers that the father "was acting in a very quarrelsome manner, as if he was mad and angry at me. I told him that my mother and grandmother had both intended the property was to be entirely mine, and neither one of them would let him get his hands on the property. And I told him I wasn't going to sign over my interest in the property.

. . . He said he wasn't going to spend all the money and everything to keep the place going and have me throw him out if I wanted to. . . . I told him I hadn't any idea; of throwing him out at all. I told him I would leave the house there, and he could stay there if he wanted to. . . . He got mad, and then he slammed his hat on the floor and went in the bedroom and shut the door. . . . ''

The appellant also told the officers, according to the stenographic record, that his father came back with a small bottle, which contained crystals, and ''told me that with my cold being bad that way I had better do something for it before I went in the army . . . and that he had something there, Vitamin B-1, stuff that was good for colds . . . I could smell the stuff, [and] . . . I knew it wasn't Vitamin B-1 . . . I told him I wasn't going to take it. . . . Then he commenced getting madder than ever and acted violent. He asked me if I wasn't going to sign the property over, to get out of there. I told him the property was mine and I wouldn't get out of there. Then he told me if I wouldn't sign over a power of attorney, that he would destroy himself and the property, and I wouldn't be able to set foot in it again. He had said that several times, and I knew he was bluffing about it. . . . Then he told me to get the hell out of there before he got his hands on me and killed me . . . well, he stood up when he said that. . . . When he acted that way I was getting scared, and I grabbed my raincoat and went out the door . . . I walked down the street. . . . There wasn't any street car there at that hour of the night, so I just kept on walking all the time, and then I came downtown. I was tired and sleepy, so I went into the Baltimore Hotel and I stayed there.''

The following morning, young Rogers told the officers, he went to see a lawyer who had done some legal work for his father. The lawyer said that he could either start an action against the father, or, if he let the matter rest for a few days perhaps the situation would smooth out. He decided upon the latter course.

At the conclusion of the questioning he assured the deputies he would be available any time they wished to talk with him again. He offered himself as a witness at the coroner's inquest and the jury returned a verdict of death by suicide.

On February 16th, four months after the death of the father, the appellant was arrested on a charge connected with a claim for insurance on jewelry owned by him. On the way to the police station, so officers testified, the deaths of his parents were mentioned. The next morning, with the sheriff's file of the investigation concerning the fire at his home before them, officers began questioning him about it. From that time intermittently until March 3d he was examined and re-examined by various officers. At all times he consistently denied that he had caused the death of either his father or his mother or had started the fire which damaged the Rogers' home.

But as a part of the People's case in chief, the prosecution offered in evidence the stenographic record of a conversation with officers in the late afternoon of March 3d in which he confessed to setting fire to the house after opening the gas cock in his father's bedroom. The record also included the stenographic report of a statement said to have been made by him on the following day in which he admitted that he killed his mother by the use of chloroform and illuminating gas.

Rogers, as a witness in his own behalf, told the jury that on February 10th his father agreed to return from work about 3 p. m. to be with Mrs. Rogers while he went to a meeting of the Organists Guild of America. He was then Assistant Organist of an Episcopal church and the secretary of the Guild's local chapter. According to his testimony, his father telephoned that he would come home earlier than planned. At the urging of his mother, who said she was feeling better, he left home about 1:30 p. m.

His mother was not asleep when he left, he said on the witness stand, for he had talked with her "about three seconds" before. He took the streetcar and bus to the cathedral and practiced until after 4 o'clock. He then went to the church in Hollywood where the Guild meeting was held, and acted as secretary of a meeting of the executive committee. A dinner followed, at which he collected the tickets and talked with many of the Guild members. After the dinner there was an organ recital, which continued until about 10 o'clock.

"Did you ever have any part whatsoever in causing the

death of your mother?", the appellant was asked. "Absolutely not," he replied. He also stated that he had not seen the bottle of chloroform since he purchased it and put it away in the medicine chest, and he insisted that he did not open the gas jet before he left the house.

After the death of the mother, the father and son continued to live in the family home. Rogers, Sr., paid the bills for the public utilities. Occasionally they had their meals together. Very evidently they had little in common, although they were not enemies, the appellant testified, and he had no desire to kill his father. As young Rogers explained the situation: "We weren't exactly friendly. . . . We more or less lived in different walks of life, and there wasn't the usual father and son relationship between us. I care for music and art, and he doesn't care for anything about them at all. Lots of times he wanted me to go with him, and I refused to, and that made him rather mad."

The reason for the lack of close companionship between the father and son was the excessive use of liquor by Rogers, Sr. The father's drinking habits had been a family problem for many years, the appellant testified. And as far back as he could remember, Rogers continued, there had been arguments in the home over the father's use of intoxicants.

As to the night of the fire, the appellant's testimony is substantially the same as the statement which he gave to the deputies sheriff the day of his father's death. However, he explained that the statement is incomplete in certain particulars; also, as to some details, he later found he had been inaccurate. But he did not set the fire, or have anything to do with its cause, he testified, and he did not kill his father.

Considering the appellant's confessions, the record discloses that, although his counsel objected to their introduction in evidence upon the ground that the People had not established the corpus delicti of either homicide, their admissibility was not challenged upon any ground which required a ruling as to whether they had been freely or voluntarily made, and the trial judge evidently did not determine this of his own motion. It appears without contradiction, however, that young Rogers was subjected to more or less continuous questioning for sixteen days after his arrest before he told police officers that he had murdered his mother and father.

There is voluminous evidence concerning the methods used to obtain these confessions. Officers Shoemaker and Lindley first interviewed the appellant early on February 17th. "We finished out the morning with him and into the afternoon," Lindley said. Deputy Sheriff Carmack joined in the questioning shortly after noon. Police Lieutenant Morrell and Don Sherman also took part in it. Shortly after 3 o'clock, Dean Bloy of St. Paul's Cathedral visited Rogers, staying about 20 minutes, but in the presence of Lindley and Shoemaker. Carmack immediately resumed the questioning which continued until 6:30 or 7 p. m. During all of these hours, with the exception of the few minutes Dean Bloy was present, officers were constantly interrogating the appellant respecting the circumstances of the fire and of his father's and mother's deaths. The appellant denied he had done anything, directly or indirectly, to cause the death of either of them, or in starting the fires.

The next day, said the officers, they had a session with Rogers concerning the insurance case. On the following day, Carmack questioned him, alone, and apparently on other occasions during the following week, Rogers was subjected to further interrogation. The investigation continued for four hours on the afternoon of February 27th. Carmack also told of two other lengthy afternoon questionings when the appellant was brought to the "green room" of the county jail in custody of a deputy sheriff. At the first, only Carmack and Morrell were present. It lasted "an hour or more." The other time, Carmack said, only Morrell was present, and the questioning continued an hour and a half and might have been for a shorter or a longer time. On the following day, so Carmack testified, about noon he queried the appellant for approximately 20 minutes. He then left and Morrell continued it.

Carmack also spoke of a session in a small room which "we only use . . . when the other rooms which are better ventilated" are engaged. And he admitted that at one time he took appellant out of the county jail at dusk, or at about dark, in connection with the inquiry. But the appellant still maintained his innocence and said he was answering all the questions fully and truthfully.

Don Sherman is a significant figure in connection with

the questioning of Rogers. He was an insurance adjuster who, in November, 1941, solicited Rogers for employment in connection with the preparation of fire insurance claims. He collected, for Rogers, the insurance on the furniture which had been damaged. By a strange coincidence, on the same day that the police officers took Rogers into custody, Sherman was arrested on a charge of issuing checks with insufficient funds to meet them. It may be inferred that when the investigating officers learned of Sherman's acquaintance with Rogers, they conceived the idea of using him to get information for them from the appellant and to carry suggestions and promises to him. The record shows that Sherman was released the morning after he was arrested and, according to his own testimony, when talking with Rogers later, he intentionally gave the impression that he was still in custody. Sherman took part in the questioning of Rogers and it was he who, from the testimony of Carmack, left to deal with Rogers alone, secured the confession relating to the death of Mrs. Rogers. But as related by Sherman, he obtained both of the confessions.

The record includes a photograph of Rogers and those who were with him on March 4th when the crimes were confessed. Rogers had considerable growth of beard and showed the effects of strain and exhaustion. Apparently he had not shaved since at least February 27th, for Carmack testified concerning a conversation of that day: "I noted . . . that he wasn't shaven, and I asked him why. . . . He said he was going to let his beard grow, he thought it would be good for his face, and he didn't have a razor besides."

On the day of the confession, the interrogation commenced in the morning and continued until about 5 o'clock. Rogers was given no food in the meantime. But after he had confessed, then, said Sherman, "we suggested that we would like to get him a shave and haircut, which we did, and then took him to dinner." At that time, sixteen days after his arrest, they took him to his apartment, where he was allowed to get a razor, toothpaste, and personal toilet articles.

The appellant's testimony concerning the circumstances under which he was questioned by the police officers adds much to their version of the investigation. After the Dean's visit on the afternoon of February 17th, he said, "they didn't so much question me, they were telling me . . . that

due to the Dean's visit, they had got additional information which would absolutely cinch their case against me. . . . One officer would begin questioning me and then sometimes the other officer would break in with some question or comment, and then the other officer would come in at length, and if the other officer thought of any details, he would interpose them. That is the way the questionings proceeded. . . . They told me that they had a circumstantial evidence case on arson in the first degree, which would send me to the gas chamber and there was nothing that I could do to prevent it."

Rogers could not say, positively, he told the jury, the number of times he was interrogated between February 17th and the afternoon of March 3d, when he agreed to confess to the charge of arson and also to the killing of his father, but "not to put it too high," it was at least every other day. But after the questioning on February 21st, he said, "I was just getting into a state where I was mentally tired and I was getting so that I was beginning to forget things, and there were some details which entirely slipped my mind, and they said that those were things that they could use against me."

On February 27th, said the appellant, after he was taken to the house where the fire occurred, he was returned to the sheriff's office and the questioning continued. "Officer Doane said when he was sitting at the Captain's desk that he and the boys were tired of beating around the bush with me and if I didn't make up my mind to confess pretty soon they would find a way to make me talk. . . . Some officer in the room, I don't know who it was, asked me if I knew anything about the gold fish room . . . at the Central Station. . . . I told them that since being in jail I had learned what the gold fish bowl was and what goes on in that room. They told me if I didn't make up my mind to confess I would be a person to pay a visit to that room."

After this interview, the appellant testified, Sherman insisted that he must make up his mind whether to confess or not. Sherman told him, according to his testimony, that "if I didn't confess the district attorney was going to file first degree charges against me on all of these charges and I was a dead cinch to be sent to the gas chamber and that I had no hope whatever of proving myself innocent. He

asked me if I had ever heard anything about the Betty Hardaker case. I told him the name was familiar but I didn't recall what it was about.''

"Then" Rogers continued, "Officers Carmack and Morrell verified the fact that Betty Hardaker had been arrested on a murder charge and she had pleaded not guilty by [reason of] insanity and she was sent to some mental institution and was released after three months and Mr. Sherman told me that if I was a wise bird I would do the same thing and go to a mental institution rather than to go to the gas chamber. He said if I was willing to give this confession that the District Attorney's office would let me get by with it and that after three months I would be released and that would end the matter as far as I was concerned, and if I wouldn't do that, the charges would be filed and I would be sent to the gas chamber. . . . Mr. Sherman asked me if I had been questioned by [Mr. Shoemaker] . . . at the Wilshire station. He said, 'Well, you know, don't you, that Clyde Shoemaker is the District Attorney's Assistant.' ''

At that time, said the appellant, he was getting to the point where he "felt that confessing was the only possible way of saving my life from an unjust execution. . . . I understood that the facts could be successfully converted in such a manner that I would have no defense left.''

Sherman promised to negotiate with the district attorney's office, the appellant testified. "My reason [for admitting the homicides]," he said, "was that I saw only two alternatives, either to go to the gas chamber for crimes I had never committed or else fabricate a confession and be released . . . [Sherman] told me what the District Attorney's office told him they would do . . . that if I would agree to give these confessions that they would not press the matter at all, would let me get by with an insanity verdict, and they would have me released in three months at Mendocino.''

To understand his reasons for giving the confession, the appellant went on, it would be necessary to take into consideration "my mental and physical condition at the time. It happened that my mother and father were both dead and I was about to be inducted into the army, and I had nothing particularly in life to look forward to. Outside of that, there was the environment I was in, being in jail—I had never been in jail before and knew nothing about it—

and the whole thing was that these officers just piled more and more on me all the time, and, although I knew I was innocent, I knew I had not the slightest possibility in the world of proving [it]—that is just the way things looked to me at the time. And so then when I could see that I was just about to be executed for something I had never done I decided to grasp at that last straw and make the best out of it that I could.''

About noon on March 3d, Sherman called at the sheriff's office and saw Captain Kunou. They went to the county jail where Carmack and Morrell were questioning Rogers. At 3 o'clock, when Rogers had agreed to confess, a stenographer was called and to questions put by Carmack, Morrell, Sherman and Chief Bright, Rogers related that he had started the fire. The stenographer's notes show that this was concluded at 4:30 p. m.

Shortly after 10 o'clock the next morning, the examination was continued at the Rogers house. At 1:45 he had completed his story of the fire.

It was at this time, the appellant testified, that Sherman took him into his mother's bedroom, and there told him that ''there was a new development in the case and said if I hoped to get off on that insanity plea I would also have to say that I murdered my mother. He said I would be strengthening my case if I did that, because if anybody would commit such unnatural crimes as murdering their father and their mother and setting fire to the house, there would be no doubt in anybody's mind that I was insane. He told me if I didn't do that, that the district attorney's office would go back on that arrangement, because after making my father's suicide out to be a murder that nobody on earth would believe my mother's suicide to actually be a suicide, and he told me that I would be strengthening my case instead of weakening it. He told me if I didn't give this additional confession the bargain was off. . . . Then I started confessing again.''

At the trial the appellant urged that the prosecution had not proved the *corpus delicti* as to Courtney C. Rogers. He does not now take issue with the ruling that the burden of proof was met, but he vigorously contends that, given every favorable interpretation, the evidence shows no more than

a bare prima facie case. With such unsatisfactory and unsubstantial proof, says the appellant, even slight error in the court's instructions was prejudicial, for under a correct statement of the law the jury, as triers of the fact, in passing upon the same issue, might have arrived at a different conclusion. More specifically, he contends, by deleting a portion of an instruction which he offered, the trial court took from the jury the determination of a primary issue of his defense. And he challenges an instruction given at the request of the district attorney as, in effect, stating to the jury that, under certain circumstances, a confession may be considered as part of the proof of the corpus delicti.

With respect to the other charge of homicide, the appellant asserts that the evidence offered by the prosecution which was competent to be considered in connection with the proof of the corpus delicti was insufficient to establish a prima facie case of murder. He takes the position that all evidence respecting the circumstances of the death of Mrs. Rogers is in harmony with her suicide and that the evidence applicable to the corpus delicti does not prove a death resulting from the criminal act or omission of another. In the absence of proof of this necessary element of criminal homicide, he argues, his purported confessions were inadmissible.

The attorney general insists that, as there is sufficient evidence to show the death of the father and also of the mother by criminal means, the corpus delicti as to each homicide was proved. In defense of the criticized instructions, he asserts that, read together, they correctly state the law.

Although it cannot be said, as a matter of law, that the evidence is insufficient to support the verdict as to any one of the three crimes charged against the appellant, apart from the confessions it is inconclusive as to the cause of Mrs. Rogers' death and whether he set fire to his house after a quarrel with his father. Under these circumstances, the confessions are of unusual importance.

■ A confession, freely and voluntarily made and without offer or promise of leniency in regard to punishment, or as the result of threats or intimidation, may be used as evidence against the defendant in a criminal case. ■ But its admissibility depends entirely upon the circumstances under which it was obtained, and this presents a question which is necessarily, in the first instance, addressed to the

trial judge. (*People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863]; *People* v. *Chan Chaun,* 41 Cal.App.2d 586, 590 [107 P.2d 455]; *People* v. *Ellis,* 33 Cal.App.2d 616, 620 [92 P.2d 431]; *People* v. *Dye,* 119 Cal.App. 262, 270 [6 P.2d 313]; *People* v. *Shaffer,* 81 Cal.App. 752, 757 [254 P. 666].) A showing of any pressure which might reasonably have induced or required the confession to be made should lead the court to make diligent inquiry concerning the manner in which it was given. (*People* v. *Siemsen, supra,* p. 394; *People* v. *Mellus,* 134 Cal.App. 219, 225 [25 P.2d 237].)

■ Although a statement is neither involuntary nor inadmissible in evidence because it was made while the defendant was under arrest, that fact should be considered. (*People* v. *Chan Chaun, supra,* p. 590; *People* v. *Ellis, supra,* at p. 621; *People* v. *Mellus, supra; People* v. *Siemsen, supra,* at p. 395.) ■ Also, a confession obtained by means of questioning, particularly if carried on for long periods of time, should be admitted only when it appears, with reasonable certainty, to have been voluntarily made. (*People* v. *Dye, supra; People* v. *Clark,* 55 Cal.App. 42, 45, 46 [203 P. 781]; *cf. People* v. *Gingell,* 211 Cal. 532, 546 [296 P. 70]; *People* v. *McEvers,* 53 Cal.App.2d 448 [128 P.2d 93].) ■ And no court should countenance the use of a confession which was made under the influence of either threats or inducement. (Promise of lighter punishment: *People* v. *Johnson,* 41 Cal. 452, 454; *People* v. *Clark, supra,* p. 44, 45; *cf. People* v. *Eckman,* 72 Cal. 582 [14 P. 359]. Better for defendant to confess: *People* v. *Barric,* 49 Cal. 342, 345; *People* v. *Johnson, supra; People* v. *Leavitt,* 100 Cal.App. 93, 94, 95 [279 P. 1056]; and see, *People* v. *Gonzales,* 136 Cal. 666 [69 P. 487]; *People* v. *Castello,* 194 Cal. 595 [229 P. 855]; *People* v. *Thompson,* 84 Cal. 598, 606 [24 P. 384]. Defendant to go free: *People* v. *Williams,* 133 Cal. 165, 167 [65 P. 323]. Threats: *People* v. *Loper,* 159 Cal. 6, 17-20 [112 P. 720, Ann. Cas. 1912B 1193]; *People* v. *Flores,* 15 Cal.App.2d 385, 405 [59 P.2d 517]; *People* v. *Mellus, supra.*) ■ Moreover, although the promises or inducements are made by one without actual authority to give them effect, if they are made in the presence of one who has such authority under circumstances from which the accused has a right to assume that they were authorized, the confession so obtained is involuntary. (*People* v. *Silvers,* 6 Cal.App. 69, 72-74 [92 P. 506];

*People* v. *Williams, supra,* at p. 167; and see *People* v. *Luis,* 158 Cal. 185, 191 [110 P. 580] ; *People* v. *Rodriguez,* 61 Cal. App. 69, 86 [214 P. 452] ; *People* v. *Piner,* 11 Cal.App. 542, 553 [105 P. 780].)

In the present case, the appellant does not claim to have been physically mistreated but there is strong evidence from which it may be inferred that he was in more or less fear of the police officers. It is significant that Officer Doane, who first denied that there is such a thing as a "gold fish" room at the police station, later characterized it as the " 'crying room' where prisoners cry out their confessions" and the officers allowed a man who had been arrested on a check charge and almost immediately released to assist in the questioning. Upon their own admissions of the part Sherman played in the many questionings of the appellant, it is reasonable to believe that he was used by them to make the promises and inducements related by Rogers in his testimony.

Although it was the function of the jury, and is not the duty of the appellate court, to choose between the testimony of Rogers and that of the police officers in determining whether the confessions were voluntarily given, the problem of ascertaining what the jury concluded in this regard is complicated by an instruction given the jury at the request of the prosecution. It reads: "Proof of the *corpus delicti* means proof of the essential elements necessary to constitute the crime charged and of the existence of criminal agency or means as the cause of them. It may be proven by circumstances shown in evidence, or by inference drawn from facts proven.

"The evidence of the *corpus delicti* need not be of conclusive character, and need not necessarily connect the party informed against with the commission of the crime, in order to justify the consideration of an admission or confession of such party so charged with the crime.

"It is not necessary that the *corpus delicti* should be proved beyond a reasonable doubt before proof may be made of an admission or confession. *Prima facie* evidence of the *corpus delicti* is sufficient; and it is for the court to say whether there is sufficient evidence of the *corpus delicti* to go to the jury, precisely as in the case of any other material fact."

This instruction has no place in a charge to the jury for it states a rule of law which governs the admissibility of evidence. Also, the charge was susceptible of a construction by the jurors, in attempting to apply it to their own duties, that

the proof of each crime, aside from any confession of the appellant, had been held by the court sufficient to meet the requirements of the law, a decision which they were bound to accept. For these reasons, in *People* v. *Hubbell,* 54 Cal.App.2d 49, 56, 57 [128 P.2d 579], an identical instruction was held seriously prejudicial in view of the unsatisfactory, yet legally sufficient, proof of guilt. Although in an earlier decision the District Court of Appeal determined that the last sentence of the instruction was not erroneous (*People* v. *Stevens,* 78 Cal.App. 395, 410 [248 P. 696]), the probability of any prejudicial effect from the statement of a trial judge must be determined upon a consideration of the particular facts in each case (see *People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367]), and in that prosecution there was ample evidence to support the verdict.

Error in an instruction which ordinarily would not prejudice the rights of a defendant may justify a reversal of the judgment where the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the guilt of the person accused. *(People* v. *Silver,* 16 Cal.2d 714 [108 P.2d 4].) The question for an appellate court under these circumstances is whether, considering the entire record, the challenged instruction may have prejudiced the convicted person's rights. (Const., art. VI, sec. 4½.) If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision. (*People* v. *Dail,* 22 Cal.2d 642, 650 [140 P.2d 828]; *People* v. *Putnam, supra.*)

In the present case, it may well be that the jurors believed the confessions were not voluntarily given, yet, because of the confusing nature of the instruction telling them of the duty of the court to determine the sufficiency of the evidence of the corpus delicti before admitting a confession, they may have been constrained to reach a verdict of conviction upon each of the three counts in the belief that those determinations were compelled by the court's ruling in admitting Rogers' confessions. Consequently, because of the decidedly inconclusive character of the evidence, apart from the confessions, the giving of the instruction constituted prejudicial error.

The People incorrectly claim that the appellant relies only upon the asserted error in the second paragraph of the

instruction and, for that reason, may not have the benefit of any misleading statement in the first paragraph. True, Rogers points to the second paragraph as erroneously stating to the jury that it could consider his admissions or confessions as part of the proof of the corpus delicti. But he also asserts that the instruction, as a whole, does not recognize the duty of the jurors to determine whether the corpus delicti was proven, but only advises them of the legal principles which guided the trial judge in ruling upon his contention, presented upon an objection to the admission of evidence, that the corpus delicti had not been established. "As a matter of fact," argues Rogers, "the wording of the instruction removes such responsibility from the jury by declaring 'it is for the court to say whether there is sufficient evidence of the corpus delicti to go to the jury.'" And in conclusion, he quotes and makes a part of his argument the discussion in *People* v. *Hubbell, supra,* concerning the misleading character of the instruction.

The judgments are, and each of them is, reversed and the cause remanded for a new trial.

Gibson, C. J., Curtis, J., Carter, J., Traynor, J., and Schauer, J., concurred.