[Crim. No. 3232. First Dist., Div. Two. Feb. 5, 1957.]

THE PEOPLE, Respondent, v. ARTHUR D. GALVIN, Appellant.

Arthur D. Galvin in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and William M. Bennett, Deputy Attorney General, for Respondent.

COMSTOCK, J. pro tem.*—Arthur D. Galvin and Manuel Gonzales, his codefendant in the court below, were indicted and jointly charged by the Grand Jury of San Mateo County on seven counts of robbery and four counts of assault with a deadly weapon. They were tried by a jury and both were found guilty of all counts. Each of the robberies was found by the jury to be robbery in the first degree. Judgments were duly pronounced and entered. Each defendant moved for a new trial and for probation. These motions were denied.

Arthur D. Galvin alone appeals from the judgment of conviction against him in which he was sentenced to imprisonment in the state prison for the terms prescribed by law, the

---

*Assigned by Chairman of Judicial Council.

sentences to be served concurrently. He also appeals from the order denying his motion for a new trial.

Appellant appears here in propria persona. It is most difficult for us to determine from his brief the grounds relied upon for reversal. His brief is devoid of any of the supporting transcript references required by rule 15 (a) of the Rules on Appeal. A cursory perusal of the brief discloses that appellant is illiterate and unskilled in the law. Obviously, he labors at a great disadvantage in attempting to present his appeal. In the main, the brief consists of a diatribe against the law and its processes. An excerpt will illustrate this. We quote verbatim:

"Since every court in this union seems to overrule this case it leaves appellant with no other opinion except to pray to this court to reverse the false double jeopardy convictions and order appellant in this case discharged from custody, upon each ground set fourth independently with many combinations of compounded denials of due process of law denied them in this case, which will shock justice to see the compounded, heaped up multiple errors inflicted against them under a steam rollijg chronic, ghastly, gruesome, slavish, restricted, gagged, curtained, calculated nortorious exclusion, of disclosures of all petenent circumstances of true facts which should have been produced into an open court trial but was excluded under the cloak of laws with accompanying hardship, and preventions by subverted exact exclusins of denial of due process of law in this case appellants were doomed helpless in their tracks, with no possible chance to receive an open court fair trial, with swelling streams of broadsided news papers, of hatred, and violent bitterness against them, to create a climate of hysteria against them, by fanning the fires of hatred, not allowing appellants a sketchy token of a speculation of their rights to have an open court fair trial in this case."

Respondent has moved to dismiss the appeal upon the grounds that appellant's brief is lacking in any supporting transcript references or applicable authorities and that it is frivolous and without merit. While it is true that an appellate court is not required to speculate as to the errors which an appellant seeks to have reviewed unless he particularly sets them forth with appropriate supporting references and authorities, we are disposed to indulge liberality in this case and shall, therefore, disregard technical defects and consider the substance of the brief insofar as we are able to

understand the points attempted to be made. The appeal will be disposed of on its merits rather than upon the motion to dismiss.

Disentangled from the wholly unjustified vilification which practically obscures its substance, the essence of the appeal is: (1) That the verdict and judgment are contrary to law and the evidence; (2) that appellant has been placed twice in jeopardy for the same offense in violation of section 1 of the Fifth Amendment to the Constitution of the United States and article 1, section 13 of the Constitution of California, and has been convicted and is being punished twice for the same offense, contrary to the provisions of section 654 of the Penal Code; (3) that appellant was charged with second degree robbery and convicted of first degree robbery.

The record, viewed in the light most favorable to the People, discloses facts which may be summarized as follows:

On October 3, 1955, at approximately 1:30 a. m., Arthur Galvin and his codefendant, Manuel Gonzales, entered a tavern or barroom known as the 751 Club in South San Francisco. Each held in one hand an object resembling a metal bar or pipe, wrapped or rolled in newspapers, and held a handkerchief to his face with the other hand. Present in the barroom were the proprietor and bartender, Herman Gambero, his wife Antoinette Gambero, Fred Rodgers and William Wallace Maher. Immediately upon entering, both defendants announced, "This is it—this is a stickup," or words to that effect, whereupon, Gonzales took a revolver from his pocket and menaced with it all the occupants of the room. He pointed the revolver at Herman Gambero while appellant moved quickly behind the bar and ordered Gambero to open his cash register. Gambera complied and appellant emptied its contents, taking therefrom $95. Both defendants ordered Mr. and Mrs. Gambero, Rodgers and Maher to go behind a low partition in the room and lie face down on the floor. They complied. Appellant ordered Herman Gambero back again behind the bar and commanded him to open a second "till" in which nothing was found. He also directed Gambero to hand him his wallet, which Gambero did, appellant taking $100 therefrom. Gambero was again ordered by defendants to lie face down on the floor behind the partition. While said four people were lying on the floor, appellant struck William Wallace Maher on the head with a heavy instrument which he held in his hand. Rodgers stated that the instrument was a bar or pipe, rolled in news-

papers, and that appellant had several times poked and jabbed him with it while causing the victims to lie on the floor. Maher said he was not sure what it was that hit him, but it felt like a gun. While the victims were lying down, the door to the barroom was opened and closed a couple of times and bottles were being "juggled around" by the defendants. Before the defendants left the premises, they shoved all four victims into the ladies' room where they remained five or six minutes. After the bandits left, one and one-half cases of whiskey were found to be missing from Gambero's stock of liquor. The entire series of events from the time of defendants' entry until their departure consumed about twenty minutes. During this time, defendants played the "juke box" on occasions. Several times they removed the handkerchiefs from their faces, affording the victims a good opportunity to see them. Mr. and Mrs. Gambero and Mr. Rodgers positively identified both defendants. Neither Rodgers nor Maher was robbed. One of the counts of assault with a deadly weapon dealt with the striking of Maher. No charge was made with respect to any act against Rodgers or against Mrs. Gambero.

On October 18, 1955, at approximately 1:30 a. m., appellant and Gonzales entered a bar known as the Towne House in South San Francisco. They held handkerchiefs to their faces and announced, "This is a stick-up," or similar words. Upon entering, each held an instrument in one hand resembling a metal bar or pipe, rolled in newspapers. Gonzales stood by the door and pulled a revolver from his pocket, menacing with it all occupants of the barroom, of whom there were approximately 12 or 14. Appellant moved promptly to the bar where Chester Luchini, the owner and one of the bartenders, was standing and struck Luchini a hard blow on the head as he walked around the end of the bar. Luchini was knocked down and "passed out" for awhile. The instrument used was the metal object, wrapped in newspapers, held in the hand of appellant. Appellant looted the cash register and safe of approximately $1,500. When defendants entered, some of the occupants of the room were seated on stools at the bar and some seated at tables in booths. All were told by defendants to put their heads down, to not look up and to put their money, wallets, purses or billfolds on the bar or tables. Before the people were ordered into the booths, a patron described only as "Eddie," a cousin of

Luchini's from Canada, was on the dance floor with one of the female patrons. He thought the holdup was a joke and started to dance but was promptly struck on the head by Gonzales with the revolver. Then they were all herded by defendants into the booths and ordered to sit down and put their heads on the tables. John Sartoris and Charles Soldani, also known by the nickname "Speedy," were in one of the booths with others. Sartoris attempted to argue with Gonzales who fired a revolver at him, the bullet striking the back of the booth and being later recovered from the floor. The discharge was close to Pearl Verandes who received a powder burn on the arm. Gonzales struck Soldani a blow across the forehead with the revolver. (The details of this assault on Soldani will be further set out and discussed later in this opinion.) When the victims were ordered into the booths, defendants commanded them, "Throw your billfolds on the tables." Among others, Soldani put his money on the table in the booth where he was seated. Later they were all ordered to go into the washroom and stay there, the defendants announcing that they were not going to leave right away. The door to the washroom was locked by the defendants. During the time defendants were in the room they played the "juke box" several times. After defendants departed from the premises, the victims were released from the washroom and all of them who had placed money, purses, wallets and billfolds on the bar or tables found their money missing. The evidence indicated that defendants took the money from the tables while the victims were in the washroom. Defendants removed the handkerchiefs from their faces several times during the sequence of related events. Both of them were positivly identified by several witnesses.

Count three of the Indictment charged the defendants with a robbery against Chester Luchini and count four charged them with an assault with a deadly weapon against the same person. Count five charged them with a robbery against Soldani and count six with an assault with a deadly weapon against Soldani. In view of appellant's contentions with respect to these charges being based upon a single, indivisible act, a more detailed discussion of the facts as related to these two victims is in order. Luchini testified that just before he was struck, he was busy making change for a customer. He did not know a robbery was in progress until he was hit on the head. The $1,500 was taken from the safe and cash register after he was struck. He was groggy from the blow

during the time the people were herded into the booths and then into the washroom. The weapon with which he was struck was wielded by appellant and was a metal bar or pipe, rolled in newspapers. He bled from the blow and subsequently required medical and hospital attention as a result. It definitely appears from direct testimony that the force inflicted upon him in the assault was the very force which was an essential ingredient of the robbery of the $1,500. With respect to Soldani, he testified that he was struck across the forehead with a gun by Gonzales ''during the course of the robbery''; that it was done while the appellant was robbing the cash register, when ''they'' were ''moving people around''; that defendants said, ''Throw your billfolds on the table''; that he did so and ''found'' $45 missing from it. Other witnesses testified that it was after they came from the washroom that the money they had placed on the bar or tables was found to be missing. The looting of the $1,500 from the cash register and safe was done early in the course of the robbery. So was the shooting at John Sartoris in the booth where Soldani was and Pearl Verandes received her powder burn. From this, and other evidence dealing with the sequence of events it appears that the striking of Soldani was done before defendants came into actual possession of his money. There is no direct evidence that the blow was struck after defendants obtained Soldani's $45. It thus fairly appears that the force used directly upon him was an essential element of the robbery committed against him and was not a later, independent act.

Gonzales was arrested at an early morning hour on October 19, 1955, just after he came out of Cadena's Bar on Third Street, in San Francisco, and entered a car equipped with license plates listed with the police as belonging to a wanted vehicle. Three police officers ordered him to halt. He refused and, instead, put his car rapidly in motion and attempted to run down one of the officers. They fired several shots both into the air and at Gonzales' car. He crashed into a parked car belonging to one of the officers and then crouched out of sight in his vehicle before emerging on command. A .38 caliber pistol cartridge was found by the police under the mat in the Gonzales automobile containing a bullet identical in size and weight to that recovered in the Towne House. Upon being interviewed at the Potrero Station, after arrest, Gonzales gave a false name of John Martinez. He also gave evasive and false answers to questions. A search of his

person revealed another, identical .38 caliber pistol cartridge, concealed in the watch pocket of his trousers. Identifying papers were found in Gonzales' car and he later admitted his true identity.

Appellant was arrested about 2:30 a. m., on October 19, 1955, in an automobile parked near a house known to the police as Gonzales' residence in San Francisco. Galvin and Simon Gonzales, a half-brother of Manuel, had been drinking together. Both were asleep in the car. Galvin had not reported for work on October 19, 1955, at his regular job with Plastic Productions in Redwood City. Upon being interviewed, he denied any knowledge of the robberies and claimed he was only casually acquainted with Manuel Gonzales, though he had known Simon since 1950.

At the trial, both defendants denied categorically any part in the offenses charged. Galvin claimed he had never been in the Towne House and Gonzales that he had never been in South San Francisco. Each offered evidence which, if believed by the jury, would have tended to establish an alibi. Upon being cross-examined each admitted having been formerly convicted of a felony.

Each robbery victim testified to his money having been taken from his person or immediate presence by the defendants, as charged in the indictment, and described the force used, or threats of force, putting him in fear, in the taking. There was abundant corroboration. Several witnesses testified to all essential facts to establish the four charges of assault with a deadly weapon. The evidence leaves no doubt that defendants acted in pursuance of a common design, aiding and abetting each other in every act of which they were accused. Each was therefore fully responsible as a principal for the acts of the other. The claim that the evidence does not support the judgment and that it is against law is without merit as to all counts upon which the guilty verdicts were based except counts four and six, charging assaults with a deadly weapon upon Chester Luchini and Charles Soldani, respectively. These two counts will be discussed later. The jury heard the evidence and obviously believed the case made by the People and rejected the evidence brought forward by the defendants. An appellate court does not concern itself with conflicts in the evidence where that in support of the prevailing side has substance. Here, the case made by the People was very strong upon the facts.

Turning to appellant's contention that he was subjected

to double jeopardy and deprived of his statutory rights under section 654, Penal Code, we find it unnecessary to enter upon an extended discussion of the constitutional questions as such, involving possible fine distinctions between double jeopardy in the constitutional sense, and statutory safeguards against conviction or punishment for a criminal offense perpetrated by one, separate and indivisible act and also for a lesser included offense. Appellant's claim of error in this regard is adequately disposed of by a consideration of the effect of section 654 of the Penal Code as applied to the facts of this case. ▮ As we have seen, the assaults upon Luchini and Soldani were made preceding or concurrently with the taking of their money. As was said in *People* v. *Logan,* 41 Cal.2d 279, at 290 [260 P.2d 20], ''The one act of inflicting force with the bat cannot both be punished as assault with a deadly weapon and availed of by the People as the force necessary to constitute the crime of robbery, for 'co-operative acts constituting but one offense when committed by the same person at the time, when combined, charge but one crime and but one punishment can be inflicted.' '' (Citing cases.) That case is determinative of the appeal here so far as the judgment and sentence apply solely to counts four and six of the indictment and the verdicts limited thereto. In said case, the decisive factors were that the defendant struck his victim a vicious blow upon the head with a baseball bat, then snatched her purse, containing money, and fled. The instant case is like that and must be distinguished from cases like *In re Chapman,* 43 Cal.2d 385 [273 P.2d 817], where the victim was first robbed by being menaced by one of the robbers with a deadly weapon and placed in fear, then fled and was pursued, tackled by one defendant and beaten with the weapon by the other, the decision being that the assault was a separate, divisible act, independent of the robbery and not an element thereof.

Appellant's argument on the double jeopardy or included offense theory seems also to be based on the premises that the entire series of events on each date, October 3, and October 18, 1955, constitute but one, or, at most, two crimes.. This claim is clearly untenable. ▮ In crimes against the person, there are as many offenses as persons affected. (*People* v. *Lagomarsino,* 97 Cal.App.2d 92 [217 P.2d 124].)

Appellant contends that he was indicted for robbery in the second degree and convicted of robbery in the first degree. This claim is also without merit. In the first place,

each robbery count alleged robbery generally and then specifically pleaded facts, later proved, which constituted first degree robbery. ▪ Even a charge of robbery without specifying the degree is sufficient to sustain a conviction of robbery in the first degree. (*People* v. *Hayes,* 118 Cal.App. 341 [5 P.2d 439].)

We find no other points in appellant's brief which merit discussion.

The judgment of conviction of assault with a deadly weapon as to counts four and six is reversed. As to all other counts and in all other respects the judgment is affirmed. The order denying appellant's motion for a new trial is affirmed. Since we have considered and disposed of the appeal on its merits, the People's motion to dismiss the appeal is denied.

Dooling, Acting P. J., and Kaufman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 2, 1957. Schauer, J., was of the opinion that the petition should be granted.