[Crim. No. 3955. First Dist., Div. One. Dec. 20, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. LEMONE BROWN, Defendant and Appellant.

Peter F. Sloss, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

TOBRINER, J.—Our first task, here, is to determine if an involuntary admission induced by a person not officially connected with the prosecution may be admitted into evidence. Although no California case expressly so states, we think that such admission is inadmissible if rendered to a person whom the defendant reasonably believes has been designated by the prosecuting officers as one whose promises will probably be fulfilled. As we shall explain, appellant's admission here meets the test; it should not have been accepted into evidence.

Our second problem centers upon whether appellant suffered the double punishment proscribed by section 654 of the Penal Code in that he was convicted of assault, rape, perversion and robbery, although the force and threat of force equally applied to all the crimes. We cannot distill from the ingredients of force involved in the other offenses an independent objective to employ force in a separate assault not involved in the perpetration of the other crimes.

According to the testimony of the prosecutrix, the course of conduct which led to appellant's conviction for the four crimes began at about 3 a. m. in the morning of December 17, 1960, when she saw someone standing in her bedroom doorway. A man jumped on her bed, grabbed her by the throat and told her to "shut up" or he would "kill" her. He beat her; at the same time, in violation of section 288a of the Penal Code, he kissed various parts of her body. When the man told the victim that he intended to have intercourse with her, she expressed a fear of pregnancy; he allowed her to obtain a diaphragm. Because he remained behind her all the while, holding her arms tightly, she could see only the man's black hands. After she had obtained the diaphragm, the man led her to the living room, forcing her to stand unclothed in the doorway. He then took her back into the bedroom, struck her again and had intercourse with her against her will. He told her to turn over and not to look, saying he was going to kill

her. He jumped up, rushed out of the room, and, as he left, grabbed her purse.

The victim testified that she called the Sheriff's Department or the police. When the police arrived she was hysterical and received medical attention.

The police began a search for the assailant. A deputy sheriff saw a 1955 Oldsmobile parked near the victim's apartment, looked at the registration, and found that it was registered to appellant. The occupant was not nearby. When the deputy returned later, the car had disappeared. The police issued an all-points bulletin for the car; about one hour later an officer found it on San Quentin Road; in the car he discovered appellant, who had apparently been sleeping. Although appellant asserted that he had been there for a couple of hours, the hood was warm. According to Officer Burnham, who arrived later, appellant said he had been out "partying" in Richmond from 10 p. m. to 4 a. m.; after he returned to Marin County he had trouble with the ignition switch on his car.

Appellant's story of attending a party in Richmond was verified by Leola Hebert who said she saw appellant leave a café in Richmond with a friend, Eddie Howard, at 2:45 a. m. The prosecution later called her as a witness and her story became more uncertain; she redetermined the time of appellant's departure from the café as 2:15 a. m. The owner of the café testified that appellant was not there after 2 a. m., although appellant said he left at 2:45 a. m. Another witness, Eddie Howard, testified that he spent the night with appellant; that they left the café about 2:45 a. m. They went to a club, the Long Star, and later drank in appellant's car.

The victim made a reasonable identification of appellant at the trial but was unable to identify him in a line-up the day after the attack. She said that he disguised his voice at the time of the line-up; her identification at the trial was partly based on appellant's voice. She also identified appellant's sweater as similar to the one worn by the attacker.

The admissions of appellant, which raise so serious a question here, involved disclosures of appellant that he had intercourse with the prosecutrix, with her consent and at her invitation, in her apartment at the described time. At the trial, however, appellant denied the truth of this statement; he denied, too, that he knew the victim or had relations with her. His further testimony at the trial paralleled his original statement to the police. He said he had "partied" in Richmond, finally leaving at about 4 a. m., driven across the Richmond

Bridge to Marin County and had car trouble. He tried to fix the car but failed, and so he walked to his place of employment for help. He had not found anyone, went back to his car and was able to fix it this time. He began driving again, felt sleepy, pulled off the road and parked where the car was later found by the police.

Appellant pleaded not guilty to the four counts of assault, rape, robbery and sexual perversion; the jury returned a verdict of guilty on all counts. We deal, first, with the question of the admission, and then with that of the alleged double punishment. Our decision upon these issues renders unnecessary a consideration of appellant's other contentions of prejudicial error.

The introduction of appellant's statement of December 24th would, if the admission were involuntary, have subjected appellant to prejudicial error. The statement contained an admission that appellant visited the apartment of the prosecutrix and had intercourse with her, a fact that appellant denied on the witness stand. As respondent states, "Certainly if there were uncontradicted evidence in this record which established that appellant made the statement because of promises of leniency and the release of his automobile, it would have been prejudicial error to use the statement at the trial."

The contentions as to the involuntary admission arise from two alleged incidents, the first of which involved a claimed promise of the release of appellant's automobile, and the other, an alleged promise of withdrawal of the charges.

The police impounded appellant's car at the date of his arrest but, one week later, released it to his wife. She had importuned the Sheriff's Office for it, claiming she needed it for her work. She had visited appellant in jail and told him she could not get the car. The police had contended that they wanted to check the car for possible evidence and that they might send it to the state criminology laboratories in Sacramento. We shall discuss below Inspector Bridges' alleged promises to appellant as to the car.

The second incident involves the promised withdrawal of the charges by Harmon, the polygraph operator. After appellant had been in custody for one week, the sheriff's officers took him from confinement in San Rafael to Harmon's office in San Francisco. When he arrived Bridges was there and in conference with Harmon. Harmon questioned appellant while

the two of them alone were present. When they came out of the room Harmon told Deputy Sheriff Burnham that appellant had been "cooperative" and that Burnham should tell Bridges that "everything is okay." They all shook hands; Burnham left with appellant. On the return to San Rafael, Burnham, according to appellant, "told me that it's a lot of women runs around that is from Marin City . . . they go out with these fellows, and the first time something happen that they call the law [*sic*]."

Upon arriving in San Rafael Burnham took appellant back to Bridges and they made the tape recording which contains the admissions. At the opening of the recording appellant states he is "concerned" about his car. The inspector answers: "Well, I told your wife today to call me at 4:00 o'clock. And if you were fair and considerate with me, I would be more than fair with her, and I would release the car to her."

Appellant then asks: "Now what about the charges on me? They couldn't be dropped or anything?" Bridges answered, ". . . I don't know what you are going to tell me." Then appellant said, "Well, I just want to tell you about—*you know*—." (Emphasis added.) Appellant seems to suggest that Bridges knows the nature of appellant's previous disclosures to Harmon, and Inspector Bridges answers, "Well, let's do this. You tell me what you have to tell me. I'll be fair with you." Significantly, then, in the absence of any suggestion by appellant of his admissions to Harmon, the *inspector* now brings up Harmon's name. He says: "I can assure you of this: That Mr. Harmon and I have been friends for a long time. Mr. Harmon has worked on such great things as the War Crimes Tribunal in Nuremberg, Germany—all the big Nazi war criminals. . . . He was involved in running the polygraph tests in those kind of things with the world's greatest criminals, and I have a great deal of respect for the man, and I am sure he respects me." Bridges concludes, "So you tell me what you have to tell me, and I will see what I can do for you. As it stands right now, I want to make sure that you understand I promise you nothing except to be fair with you."

Following this statement appellant rendered the admissions which he now claims to be prejudicial. Thereafter appellant asked the inspector whether his wife would "know all about all of this"; Bridges states that he must "report these things to the District Attorney" and finally states, "I can't promise you anything. . . . All I will tell you is this: At 4:00 o'clock

this afternoon when she calls, I will say, 'You can have your car back.' That is all I am going to tell her.''

As to the prior conversation of Harmon and appellant at Harmon's office, the exchange upon which appellant relies for the involuntary admission, appellant testified *without contradiction* that Harmon ''explained to me that I could submit to this, and everything would be fine. See, *I wouldn't get charged with it,* or anything. All they wanted to do was clear it up.'' (Emphasis added.) We set forth the full testimony in the footnote.*

Whether the inducements as to the car were sufficient to produce an involuntary admission we need not decide. We are satisfied that the Harmon incident clearly did so. As to the car, Inspector Bridges' words of ''fair'' and ''considerate,'' were possibly equivocal. But these words, when coupled with Harmon's uncontradicted specific statement that appellant would not be charged, complete a pattern of promises that clearly make of the second incident an involuntary admission. In this background there is nothing equivocal as to Harmon's alleged statements.

We shall point out that the Harmon incident, first, involved a clear statement of a strong inducement to confess, and, second, emanated from a person upon whom appellant could reasonably rely.

---

*''A. Well, Mr. Harmon and I had this conversation. He explained to me that a woman had told Mr. Bridges and them that I was charged with these offenses, and that he wanted me to help Mr. Bridges clear this up, because he and Mr. Bridges was very good friends, and that he would like for me to help too.

''I asked him in what way. He explained to me that I could submit to this, and everything would be fine. See, I wouldn't get charged with it, or anything. All they wanted to do was clear it up.

''At that time I told him I couldn't admit to that because I didn't know anything about it. So he tells me then that if I don't admit to it, by he and I being together he could come into court and say I did it anyway.

''And so I say I didn't see how he could do that. Then he tells me he and Mr. Bridges had been working for a long time, and that he didn't feel like this woman was telling the truth, anyway; that he had interviewed her.

''And then that is when I say, 'Well, what would be the results if I did say that?'

''He said, well, all they wanted to do is clear it up, and that would be all.

''Then I told him that I was there, by—which I admitted.

''Q. All right. Now, did you have any further conversation with Mr. Harmon at that particular time? A. Mr. Harmon told me that—to be very cooperative with Mr. Bridges, and that Mr. Bridges would be fair and turn me loose. That was all.''

The Harmon conversation, if true, sharply offered a promise of leniency. According to appellant, Harmon told him that if he rendered the admissions, he would not be charged. Appellant likewise stated that Harmon threatened that if appellant did not make the admission, Harmon would nevertheless claim that he had done so. "So he tells me then that if I don't admit to it, by he and I being together he could come in to court and say I did it anyway."

Not one word in the record contradicts this testimony of appellant. Harmon did not even take the stand. Burnham did testify but said nothing to rebut appellant's testimony of the Harmon conversation. Nor did he testify as to his alleged conversation with appellant when they returned from Harmon's office on December 24th.

Respondent contends that the statement was not induced by a promise of leniency because appellant was twice advised by Inspector Bridges that he could not dismiss the charges and that only the district attorney could do so. In the first instance to which respondent refers appellant had previously admitted his presence in the apartment, and the inspector's discussion turned upon whether information of his infidelity would be kept from appellant's wife and not whether the charges would be dropped. In the second instance, appellant had already completed his statement and was about to sign it. Although Inspector Bridges testified to the voluntariness of appellant's admission, Bridges did not, and could not, contradict appellant's testimony regarding the conversation with Harmon.

We conclude that the record compels the acceptance of appellant's uncontradicted testimony and that the inducement was both clearly stated and powerful. The inducement fully meets the test of the cases. (*People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323] ; *People* v. *Berve* (1958) 51 Cal.2d 286 [332 P.2d 97] ; *People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal. Rptr. 759, 354 P.2d 231] ; *People* v. *Brommel* (1961) 56 Cal. 2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].)

We turn to the second question as to whether appellant may claim improper inducement when he relied upon the word of Harmon, who was not a law enforcement officer. As we have indicated, we believe the test must be whether appellant reasonably believed that Harmon had been designated by the prosecuting officers as one whose promises would probably be fulfilled.

■ That the inducement which renders a confession involuntary may emanate from a third party, rather than the police, is demonstrated by *People* v. *Rogers* (1943) 22 Cal.2d 787 [141 P.2d 722]. ■ There the defendant's confessions were obtained while he was alone with an acquaintance, Sherman, who had been in previous custody and falsely intimated that he so remained. "The record shows that Sherman was released the morning after he was arrested and, according to his own testimony, when talking with Rogers later, he intentionally gave the impression that he was still in custody. Sherman took part in the questioning of Rogers and it was he who, from the testimony of Carmack, left to deal with Rogers alone, secured the confession relating to the death of Mrs. Rogers. But as related by Sherman, he obtained both of the confessions." (P. 800.) The court notes that Sherman "was used" by the police officers "to make the promises and inducements" described by the defendant. (P. 806.) The court declares: "Moreover, although the promises or inducements are made by one without actual authority to give them effect, if they are made in the presence of one who has such authority under circumstances from which the accused has a right to assume that they were authorized, the confession so obtained is involuntary." (P. 805.) The court thus alludes to a situation in which the third party induces the confession in the presence of one in authority. As we have pointed out above, *Rogers* itself, however, involved a situation which went beyond that which it describes: the defendant confessed outside the presence of an officer by reason of the inducements of a third party.

The *Rogers* situation makes a weaker case for the involuntary confession than the instant one since, here, the persuader occupied a status closer to the prosecutor than did the supposed inmate in *Rogers*. *Rogers* relies upon earlier California cases which discuss the requirement that the inducement must be rendered in the presence of one authorized to render it, but they also contain language which in dicta at least describes a wider area for the inducement.

Thus in *People* v. *Luis* (1910) 158 Cal. 185 [110 P. 580] the court upheld the admission of a confession procured by a third person who advised defendant that "it would probably be better to tell the truth" but offered no improper inducement. (P. 191.) At the same time, the court suggested in dicta that a confession given to a third party who was sanctioned by the police and who had offered improper inducements might cre-

ate a different ruling. The court said: "We are aware of no case holding that a confession should be excluded merely because it was induced by the advice of a third person to the effect simply that it would probably be better to tell the truth, given in the absence of any officer or person in authority, *and not given under such circumstances as to lead the accused to suppose it was given with the sanction of any such person.*" (P. 191; emphasis added.)

Again in *People* v. *Piner* (1909) 11 Cal.App. 542 [105 P. 780], cited in *Rogers,* the court points out that a third person, a cousin of the accused, had persuaded the defendant to confess, offering to "help" him (p. 550), but did not produce a scintilla of sanction from the authorities to offer leniency. The court suggested a different result would have followed "if Robison had, in order to extort a confession from Piner, and by such means obtained it, represented to him that he (Robison) was in a position to insure him (defendant) either complete immunity from prosecution or lenient treatment in the matter of punishment. . . ." (P. 553.)

The early case of *People* v. *Smith* (1860) 15 Cal. 408, and *People* v. *Berve, supra,* 51 Cal.2d 286, deal with corollary situations which cast some light upon the instant one. Thus in *Smith* the owner of the stolen property told the defendant that he would use his influence to get defendant acquitted if defendant would disclose his confederates. Refusing to permit the admission of the ensuing confession, the court nevertheless raised the question as to whether there was a difference in confessions induced by those authorized to control the defendant and those induced by persons having no such authority. *Berve* involved the contrasting situation in which a confession had been coerced by third parties through the use of force. The court does not distinguish between the authorities and the general populace as to such coercion, saying: "No valid grounds for distinction are to be found in the fact that the coercion in this case was inflicted by civilians, and not the police. Decisions holding that confessions are inadmissible because they were rendered under conditions of threatened mob violence by civilians against an accused clearly imply such conclusion." (P. 293.)

While we believe the California cases recognize that an involuntary confession may result from the improper persuasion of a third party, if the defendant reasonably believes that he has been designated by the prosecuting officers as one whose promises will probably be fulfilled, we find the New Mexico case of

*State* v. *Foster* (1919) 25 N. M. 361 [183 P. 397, 7 A.L.R. 417], affords the most direct expression of the ruling: "Appellee insists that, even though the confession was involuntary, the promises which induced it were not made by persons in authority. But the question must not be whether the persons making the promises were persons in authority—that is, capable of performing their assurances of immunity, but were they in such a situation that the person confessing might reasonably consider them as persons able to afford him aid? 1 Bishop's New Criminal Procedure, 1234. That the appellant in this case had abundant reason to believe that the owner of the cattle and a cattle inspector had it in their power to do him very considerable favors, in the situation he was in, is not to be seriously questioned." (P. 398 [183 P.].)

We have previously set forth the facts which led appellant reasonably to rely upon Harmon's promise and to believe it would probably be fulfilled. The Sheriff's Office took appellant to Harmon's office where Inspector Bridges was already in conference with Harmon. Harmon as an operator of a polygraph mechanism could easily be deemed to be a part of the prosecution investigative force. Bridges told appellant of his high esteem for Harmon. Harmon told appellant that "he and Mr. Bridges had been working for a long time." "Harmon told me . . . to be very cooperative with Mr. Bridges, and that Mr. Bridges would be fair and turn me loose."

The cajoled confession is no less obnoxious because the person who procured it is one step removed from the police or the prosecutor. It is no defense that the authorities only threw a figurative arm around the cajoler but did not make him an official agent. It is enough if the action of the authorities reasonably led the confessant to believe that the word of the persuader would be heeded and his promise probably fulfilled.

We turn to the question of whether the multiple conviction for assault, rape, perversion and robbery violated the proscription of section 654 of the Penal Code against double punishment. While ample evidence sustains the conviction for assault, our inquiry must be directed, as appellant points out, to whether "there is . . . [a] showing of the use of any force or a threat of force other than as a means of accomplishing the acts which form the basis of the other crimes charged." The robbery (Pen. Code, § 211) and the type of rape involved here (Pen. Code, § 261, subpar. 3) obviously involved the use of force and threat of force. Although a violation of section

288a of the Penal Code does not necessarily comprehend the use of force, the jury found specially here that appellant "compelled Coparticipation in his act by force, violence, duress, menace and threat of great bodily harm."

 Describing the test which we must apply here, *Neal* v. *State* (1960) 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839], states "Punishment for two offenses arising from the same act is prohibited by the constitutional and common-law rule against multiple punishment for necessarily included offenses (*People* v. *Kehoe,* 33 Cal.2d 711, 713 [204 P.2d 321]) and by Penal Code, section 654, which provides that 'An act or omission which is made punishable in different ways by different provisions of this code may be punishable under either of such provisions, but in no case can it be punished under more than one.' " (P. 18; footnote omitted.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (P. 19.)

Applying this test, the recent case of *In re Dowding* (1961) 188 Cal.App.2d 418 [10 Cal.Rptr. 392] held that "petitioner could not be sentenced for both robbery and burglary," stating that "while the crime of burglary was complete when petitioner and his codefendants entered the drug store with the intent to rob the druggist [citations], and petitioner might have been convicted of this offense even though he and his confederates had been frustrated in their attempt to rob the druggist, still their acts constituted a continuous course of conduct and the object of that course of conduct was the robbery of which petitioner was convicted. . . ." (P. 423.)

The earlier case of *People* v. *Logan* (1953) 41 Cal.2d 279 [260 P.2d 20] involved a situation in which defendant hit his victim over the head with a baseball bat, took her purse and fled. The court held: "The one act of inflicting force with the bat cannot both be punished as assault with a deadly weapon and availed of by the People as the force necessary to constitute the crime of robbery, for 'co-operative acts constituting but one offense when committed by the same person at the same time, when combined, charge but one crime and but one punishment can be inflicted.' " (P. 290.) (See also: *People* v. *Galvin* (1957) 148 Cal.App.2d 285 [306 P.2d 575]; *People* v. *Brown* (1948) 87 Cal.App.2d 281 [196 P.2d 936].)

We now analyze the facts of the present case in order to show that appellant's use of force served as a common means to accomplish the rape, the perversion and the robbery and not apart and separate from them. The record does not show any separate "divisible" intent to use the force for any other purpose than the consummation of these crimes.

Appellant's use of force began at the very outset of his criminal course of conduct and continued throughout it. When the victim first saw appellant, and he jumped upon her bed, he struck her, grabbed her and told her to "shut up" or he would "kill" her. Each of her attempts at this time to dissuade appellant produced only further violence. Indeed, the victim, testified that she then realized that appellant's continued blows were administered to keep her quiet. Obviously appellant attempted to beat his victim into submission to the acts of sexual perversion.

At one point during this episode appellant allegedly asked his victim if she had any money. "After he had . . . threatened to kill me, then he said . . . if I would be quiet I might not be hurt." "He also at one time asked where I kept my money. . . . I believe he asked that before he took the covers off. . . ." This incident shows that at this early stage appellant had conceived of the robbery and, as one step preparatory to it, engaged in the beating of his victim.

The force and violence served to frighten the victim into submission during the incidents prior to, and concurrent with, the ensuing rape. Even during the interlude when appellant permitted the victim to get a diaphragm, he constantly kept a tight hold upon her so that she could not look back to see him, and threatened that if she were to attempt to do so he would kill her. After the rape, appellant again made the same threat, which was evidently designed further to frighten the victim from interfering with the final culmination of his course of wrongful conduct in the robbery.

Appellant apparently sought to subdue and intimidate his victim in order to consummate the three nefarious crimes. We cannot cull out of it a separate and distinct objective to commit an assault as such. On the contrary the force and threat of force served as the violent means to perpetrate the other crimes.

Nor can we, as respondent urges, shape a separate objective out of appellant's alleged sadism. Contending that appellant's conduct was "motivated by a sadistic urge at least as strong as the motives of perversion, rape and robbery," respondent

cites the following suggested supporting evidence: (1) that appellant stated that he had been sent to kill the victim; (2) that appellant continued to hit his victim while engaging in acts of sexual perversion; (3) that appellant made his victim stand naked in the open doorway of her apartment; and finally, (4) that appellant continued to beat her after "she had indicated to him that she would submit to his demand of sexual intercourse. . . ."

Yet each of the above factors fits into the rape and the perversion; they are not unlikely concomitants of these crimes; the force and violence, as we have shown, constituted a means for their commission. We cannot, to support the judgment, reach to an artificial and esoteric psychological motivation not at all indicated by the record.

We conclude that respondent shows no acts of violence separately motivated from those which sought to force compliance by the victim with appellant's unlawful objectives of rape, robbery and acts of perversion; the trial court erred in holding appellant guilty of assault in addition to the other offenses charged.

While we recognize the gravity of the offenses of which appellant was found guilty we are reluctantly compelled to hold that the record discloses a conviction based upon an invalid involuntary admission and a prohibited double punishment.

We reverse the judgment of conviction on all counts.

Bray, P. J., and Sullivan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 15, 1962. Schauer, J., McComb, J., and White, J., were of the opinion that the petition should be granted.