Filed 12/1/15  P. v. Sandoval CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ESTEBAN SANDOVAL, JR.,<br><br>    Defendant and Appellant. | F068485<br><br>(Super. Ct. No. MCR044961)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Kane, Acting P.J., Franson, J. and Smith, J.

Esteban Sandoval, Jr., was found guilty of various crimes related to his abduction and terrorization of his companion, Gabriella Pulido. He was sentenced to a prison term of 15 years four months, which included sentences for other criminal matters that had been pending when he committed these crimes. Sandoval argues portions of his sentence should have been stayed pursuant to Penal Code section 654. We find no merit to his contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

*The Information*

The first amended information charged Sandoval with kidnapping (Pen. Code, § 207, subd. (a)),[1] infliction of corporal injury on a cohabitant (§ 273.5, subd. (a)), making a criminal threat (§ 422), and false imprisonment (§ 236). The information also alleged these offenses were committed while Sandoval was on bail within the meaning of section 12022.1, and that he had sustained a prior conviction for domestic violence within the meaning of section 273.5, subdivision (f)(1).

*Prosecution Evidence*

Pulido testified she had been dating Sandoval off and on for about eight months, and they had cohabitated for approximately two months. On the night in question, Pulido met with Sandoval at a friend's house after she got off work. While at the friend's house, Pulido received a text message. Sandoval took Pulido's phone, and asked who had sent her the message. When Pulido told Sandoval she was not sure who the message was from, Sandoval started sending messages to the original sender. While doing so he became very angry and told Pulido she was "going to get it later." Pulido thought Sandoval had calmed down when they eventually left the friend's house. The two got into Pulido's truck and headed to Sandoval's home.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

When they got into the truck, Sandoval again got angry and began calling Pulido names. Sandoval kept repeating himself as Pulido drove. Pulido did not say anything for fear it would make matters worse. Sandoval directed Pulido to park near some apartments. Sandoval continued to yell at Pulido, and then threw her phone at her face, causing a cut on her forehead. Pulido used her sweater to attempt to stop the bleeding. Sandoval blamed Pulido for the injury, and continued to call her names. Sandoval told Pulido she needed to go to the hospital, and instructed her to invent a story to explain the injury. Sandoval then rejected the story invented by Pulido. Sandoval told Pulido he wanted to stab her with her keys, and then started hitting her on the head. Pulido pleaded with Sandoval to stop, and he eventually did.

Sandoval exited the pickup and reentered on the driver's side instructing Pulido to move over. Sandoval then drove to his mother's house where he was staying. Sandoval entered the house first and brought Pulido some ice. The two then entered the house and went directly to the bathroom, avoiding Sandoval's father who was watching television. Sandoval started cleaning the laceration, and then punched Pulido in the ribs.

Sandoval next instructed Pulido to return to the pickup and drive back to his friend's house. Sandoval retrieved something from this house, and then instructed Pulido to drive to the same apartment complex as before. Sandoval called Pulido more names, and started hitting her again. Pulido felt the cut on her forehead grow bigger, so she opened the door and ran for her life. She screamed for help as she ran because she thought Sandoval was going to kill her.

Pulido ran into a convenience store. She tried to hide, and asked one of the employees to call the emergency operator. The two would not help her, and Pulido had nowhere to hide. Pulido tried to get away when Sandoval entered the convenience store, but Sandoval, who was larger and stronger, pulled Pulido towards the pickup. He told her they had to go to his house and his mother would help. Pulido told Sandoval she did not want to go, and she tried to get away from him. Sandoval dragged Pulido to the

3.

pickup and drove her to his mother's house. Sandoval gave Pulido a pain reliever, and Pulido asked Sandoval to let her leave. Sandoval refused. He told Pulido to lay down and go to sleep on the living room floor. Pulido heard Sandoval talking to his mother, and heard Sandoval's brother come into the room.

In the morning Sandoval told Pulido to take a shower. Sandoval gave Pulido the keys to the pickup so she could get clean clothes out of it, but told her that if she did anything stupid he would kill her. Pulido asked to go home several times, but Sandoval would not let her. Sandoval and Pulido were taken to the courthouse by Sandoval's brother so Sandoval could make a court appearance. Pulido was expecting Sandoval to be detained, but he was not. After the court appearance, the three returned to Sandoval's house. Sandoval finally gave Pulido the keys to her pickup and told her she could leave.

When Pulido arrived at her house, she did not know what to do. She ended up going to sleep. When she woke up she decided to call the police. Pulido spoke with Madera Police officer Hector Garibay. Sandoval sent her numerous text messages. Pulido sent the messages to a police officer. These text messages were entered into evidence.

During cross-examination Pulido admitted that when they arrived at the courthouse she saw law enforcement officers and did not attempt to obtain help from them. Pulido thought Sandoval was going to be detained, so in her mind she was thinking that if she got to the hearing, she would be safe. Pulido also admitted she did not seek assistance from law enforcement as they were leaving the courthouse.

On the day in question, Madera Police Officer Hector Garibay responded to a call asserting an incident of domestic violence and spoke with Pulido. Pulido appeared tired, distraught, very nervous, and was crying. Garibay noticed some visible injuries, including a cut over Pulido's eye, and an abrasion near her hair line. Garibay photographed the injuries to Pulido's head, as well as the clothes she was wearing during the incident. He also viewed some text messages sent by Sandoval to Pulido after the

incident. He observed and obtained the video from the convenience store to which Pulido ran when she was attempting to escape from Sandoval. The video was consistent with the information Garibay obtained from Pulido.

Roberto Rodriguez was working at the convenience store to which Pulido ran on the night in question. He testified that Pulido looked scared, and was asking the other clerk to call the police. Sandoval eventually came into the store and pulled the woman out of the store. Rodriguez authenticated the store video of the incident, which was played for the jury.

*Evidence Code section 1109 Evidence*

Lizeth Encinas and Peter Nevarez both testified about two prior incidents of domestic violence involving Sandoval. Encinas had been in a lengthy relationship with Sandoval, and the two had a child together. After Encinas ended the relationship, Sandoval became obsessive in trying to convince her to continue the relationship. On two occasions Sandoval chased after Encinas while she was driving home from work. Nevarez, a co-worker, was in the vehicle because Encinas was giving him a ride home. On the first occasion, Sandoval drove in a reckless manner, forcing Encinas to take evasive action. On the second occasion, Sandoval's reckless driving caused the two vehicles to collide.

Selina Marquez testified about two incidents of domestic violence. She had been in a long-term relationship with Sandoval, and had children with him. On one occasion, Sandoval followed Marquez while she drove home. Sandoval again drove in a reckless manner in an attempt to force Marquez to stop and engage him. The second occasion occurred when Marquez was at home with her son and another man. Sandoval entered the residence, hit Marquez, and then attacked the other man causing serious injuries.

*Defense Evidence*

Sandoval testified in his defense. He claimed that when Pulido arrived at the party she smelled of alcohol. At one point, Sandoval wanted to make a phone call so he

5.

borrowed Pulido's phone. Before he could make the call, Pulido received a text message. Sandoval could not read the whole message because the screen on Pulido's phone was cracked. A short while later another message arrived from the same phone number.

The two left a short while later. Sandoval drove because Pulido was too intoxicated to drive. Before they left, Sandoval talked to Pulido about the messages. Sandoval stated he was very much in love with Pulido, and it was obvious from the messages that Pulido was involved with whoever sent them. When Pulido continued to deny knowing who sent the messages, Sandoval told her that if she did not tell him who it was by the time they arrived at his mother's house, he did not want anything further to do with her. On the way to the house, Pulido lunged at Sandoval to try and get her phone. Sandoval pulled to the side of the road and began talking to Pulido. Sandoval asked who sent the messages, and would not return Pulido's phone. Sandoval told Pulido she was hiding something and threatened to go through her messages. Sandoval decided to return the phone, so he "flicked" it to her. The phone accidentally hit Pulido in the face. Her head was bleeding a little. Sandoval apologized and then drove to his mother's house.

Sandoval asked Pulido to come inside the house, but she did not want to do so. Sandoval went into the house and retrieved a water bottle and a pill for pain and took them to Pulido. The keys were in the ignition of the pickup the whole time. Sandoval then drove back to his friend's house to retrieve an item. Sandoval left the keys in the pickup when he went up to the door of the house. Sandoval then drove a short distance, and stopped to look at the cut above Pulido's eye.

The two began talking, and eventually started arguing when "all of a sudden" Pulido jumped out of the pickup and started running. Sandoval followed Pulido in the pickup. Pulido ran to the convenience store. Sandoval drove to the convenience store and followed Pulido inside. Sandoval asked Pulido to leave, and she voluntarily left with him. Sandoval admitted he held Pulido by the arm, but not in a threatening fashion. Pulido hit her head as she was entering the pickup. Sandoval then drove to his mother's

house where the two slept together on a mattress in the living room (where Sandoval normally slept).

The next morning, Sandoval took a shower when he woke up. The keys to the pickup were on the couch next to where he slept. Pulido looked normal as they drove to the courthouse. After the court appearance, they returned to the mother's house. Pulido left a short while later.

Sandoval denied hitting Pulido, or using the keys to strike her. He denied forcing her to spend the night with him.

Sandoval's sister, Yessenia Sandoval, and brother, Eduardo Sandoval, testified they rode to court with Sandoval and Pulido. Both thought Pulido's demeanor was normal.

*Verdict*

The jury found Sandoval guilty of kidnapping, inflicting corporal injury on a cohabitant, and making a criminal threat. Sandoval admitted the two enhancements, that he committed this offense while on bail on another matter within the meaning of section 12022.1, subdivision (b), and he had suffered another felony conviction for an act of domestic violence within the meaning of section 273.5, subdivision (f)(1).

Two other unrelated matters had been trailing this case, so sentencing on all three occurred at the same sentencing hearing. In this case, the trial court sentenced Sandoval to an aggravated term of eight years for the kidnapping count, a consecutive term of one year four months for the corporal injury count, and a consecutive term of eight months for the criminal threat count. A consecutive term of two years was imposed for the section 12022.1 enhancement.

On the other matters, the trial court sentenced Sandoval to a consecutive term of one year and four months for child endangerment (§ 273a, subd. (a)), a consecutive term of one year for stalking (§ 646.9, subd. (b)), a consecutive term of one year for assault (§ 245, subd. (a)(1)), and a concurrent term of one year for corporal injury on a

cohabitant (§ 273.5. subd. (a)).  All of the terms except for the kidnapping count were imposed at one-third the midterm sentence.  The total prison term was 15 years four months.

## DISCUSSION

Sandoval presents two arguments on appeal.  Both arguments focus on the sentence imposed for the current offenses and rely on section 654.  The operative language of section 654 is found in subdivision (a) and states "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct."  (*People v. Deloza* (1998) 18 Cal.4th 585, 591-592.) "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

"'It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible.  [Citations.]  ...  [I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]'"  (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)  And

8.

"""a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. [Citation.]' [Citation.]" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640.)

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence." (*People v. Andra, supra,* 156 Cal.App.4th at p. 640.) "'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*Id.* at pp. 640-641.)

We shall first address, and reject, Sandoval's second argument. In this argument, Sandoval asserts, in essence, the trial court erred in choosing the kidnapping count as the principal term. Instead, according to Sandoval, the trial court should have chosen either the corporal injury count (aggravated term of five years) or the criminal threat count (aggravated term of three years) as the principal count. Sandoval reasons that his intent and objective was to punish Pulido because of his belief she was seeing someone else. Since the violence and threat counts were directly related to his intent and objective, Sandoval argues one of these two counts should have been chosen as the principal term.

This argument ignores the plain language of section 654, subdivision (a). Assuming, for the sake of this argument, all three counts were motivated by the same intent and objective, and therefore section 654 would permit punishment for only one conviction, section 654, subdivision (a) requires the trial court impose sentence "under the provision that provides for the longest potential term of imprisonment." Since the

9.

kidnapping count provided for the longest term of imprisonment, the trial court was required to choose this count as the principal term.

Above we assumed that section 654 applied to the three counts of which Sandoval was convicted in this trial. In his first argument, Sandoval asserts this assumption is correct, i.e., all of the counts were the result of the same intent and objective, and therefore he could be sentenced on only one count and the sentence on the other two counts must be stayed. According to Sandoval, his intent and objective in this incident was to either kidnap Pulido, inflict violence and threats on her, or to punish her, each as a result of her purported infidelity.

Sandoval's inability to consistently define his own intent and objective is evidence that his definitions are much too narrow. We think his intent and objective in committing each of the crimes was to punish and control Pulido. And, in this sense, he did have a single intent and objective.

However, simply because his intent and objective were the same throughout the time he was terrorizing Pulido does not mean that section 654 permits punishment for only a single crime committed during this time period. As explained above, even if Sandoval has a single intent and objective, events that were temporally separated so that the defendant had ample opportunity to reflect and renew his intent before committing the next crime are not barred by section 654. (*People v. Andra, supra,* 156 Cal.App.4th at p. 640.) This is such a case.

First, we again observe that this question is one for the trial court, and our review is limited to determining whether there is substantial evidence to support the trial court's ruling. (*People v. Andra, supra,* 156 Cal.App.4th at p. 640.) When sentencing Sandoval, the trial court demonstrated it understood its responsibility when it stated, "For Count 2 and Count 3, the Court is going to run those terms consecutive. It is based on the fact the Court heard the testimony. And they were – there was some proximity, closeness in

10.

proximity in time but they were distinct and separate offenses and added to the risk of danger to the victim in this matter."

The evidence provides more than sufficient evidence to support the trial court's conclusion. Temporally, the first crime that occurred was the corporal injury count. This occurred when Sandoval threw Pulido's phone at her face causing a laceration to her forehead.

The next crime that occurred was the kidnapping. This crime occurred when Pulido ran from the pickup to the convenience store. However, before Pulido temporarily escaped, Sandoval drove Pulido to his parent's house, went inside the house to retrieve some first aid supplies, returned to the vehicle, and drove to the his friend's house where he retrieved an item, then drove to the apartment complex where the first incident occurred. There, Sandoval began yelling at and striking Pulido. At this point, Pulido escaped from the truck and ran because she feared for her life. However, the kidnapping did not occur immediately. Sandoval exited the vehicle, called after Pulido, walked around the vehicle and closed the passenger door Pulido had left open, walked back to the driver's seat, drove to the convenience store, parked the pickup, and walked into the store to force Pulido to come with him. Sandoval had ample opportunity to reflect on his actions and renew his intent before the kidnapping occurred.

The final crime was the criminal threat. This occurred the following morning when Sandoval instructed Pulido to retrieve clean clothes from her pickup, but warned her to not do anything stupid, or he would kill her. Needless to say, Sandoval had ample opportunity to reflect on his actions and renew his intent before he made this threat.

Sandoval argues the kidnapping began when he and Pulido were at Sandoval's friend's house the first time. According to Sandoval, the kidnapping began when he first saw the text message and told Pulido she was going to get it. We read the record differently. The kidnapping occurred when Sandoval pulled Pulido out of the convenience store. This is the argument made by the prosecutor, and which is supported

11.

by the record. There is no evidence that Pulido resisted going with Sandoval at any time before she ran to the convenience store. Since we reject Sandoval's claim that the kidnapping began at the party, much of his argument must be rejected. Similarly, the cases he cites do not assist him.

In *People v. Latimer, supra,* 5 Cal.4th 1203 the Supreme Court confirmed the above rule, and held that section 654 required a trial court to stay the sentence on a kidnapping charge because the kidnapping was committed for the sole purpose of raping the victim. The defendant was sentenced on two rape counts, but his sentence could not be increased for the kidnapping count. Sandoval finds himself in a different position because the kidnapping was not committed so he could make a criminal threat, nor was it committed so he could assault Pulido. Each crime was committed to punish and control Pulido. Since it was not necessary to commit any of the crimes only so he could commit one of the other crimes, *Latimer* is inapplicable.

Similar is *People v. Brown* (1961) 198 Cal.App.2d 253 where the defendant was convicted of assault and rape. The appellate court held that since the assault occurred only to permit the defendant to rape the victim, section 654 precluded punishment for both crimes. (*Id*. at pp. 265-266.)

In this case, as explained above, while each of the crimes was committed with the same intent and objective, to control and punish Pulido, none of the crimes was committed for the sole purpose of committing one of the other crimes. Since Sandoval had ample opportunity to reflect on his actions and reaffirm his intent between each crime, section 654 will not preclude punishment for all three crimes.

**DISPOSITION**

The judgment is affirmed.

12.