Filed 12/21/21  P. v. Madueno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BERNARDO MADUENO, JR.,<br><br>Defendant and Appellant. | F079255<br><br>(Super. Ct. No. F16902078)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan M. Skiles, Judge.

Linnéa M. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Bernardo Madueno, Jr., was charged with attempted premeditated murder of Jane Doe (Pen. Code,[1] §§ 187, subd. (a), 664 [count 1]), assault upon Doe with a semiautomatic firearm (§ 245, subd. (b) [count 2]), willful infliction of corporal injury upon Doe, a cohabitant and the mother of his children (§ 273.5, subd. (a) [count 3]), and willful infliction of corporal injury upon Jane Doe 2, a child (§ 273d, subd. (a) [count 4]). The information further alleged: (1) as to counts 1 through 3, defendant personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)); (2) as to count 1, he personally and intentionally discharged a firearm and proximately caused great bodily injury (§ 12022.53, subd. (d)); and (3) as to counts 2 and 3, he personally used a firearm (§ 12022.5, subd. (a)). Following trial, the jury convicted defendant of attempted murder on count 1, found him guilty as charged on counts 2 through 4, and found true the special allegations. He was sentenced to nine years plus 25 years to life for the firearm discharge enhancement on count 1, and 16 months on count 4. Pursuant to section 654, the trial court stayed execution of punishment on counts 2 and 3.

On appeal, defendant contends that "the trial court abused its discretion and violated [his] due process right to a fair trial when it excluded evidence of three incidents in which [Doe] demonstrated her character trait for aggression relevant to [his] defense of provocation and heat of passion." (Capitalization omitted.) We reject defendant's claim and uphold the judgment.

## STATEMENT OF FACTS

On May 23, 2015, defendant shot Doe at least four times. She sustained wounds to the jaw, arm, chest, and back. At trial, the defense asserted that defendant had been provoked.

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

## I.  Prosecution's case-in-chief

### a.  *Testimony of Doe*

Doe was 13 or 14 years of age when she gave birth to her eldest child Doe 2. While Doe 2 was approximately four or five months old, Doe began to date defendant. Even at the outset, defendant acted "really jealous" whenever Doe dressed in a certain way or socialized with other people. In 2000, when Doe was 15 years of age, she gave birth to her second child B.M. and moved in with defendant and his parents. Defendant is B.M.'s biological father. Six months before graduation, Doe dropped out of high school because she could no longer deal with defendant's daily questions concerning her appearance ("did you put makeup on[?]") and her interactions ("who did you talk to[?]"; "did anybody talk to you[?]"). Doe and defendant eventually moved out of defendant's parents' residence and cohabitated elsewhere in the San Jose area. In 2006, Doe gave birth to her third child A.M. Defendant is A.M.'s biological father.

Doe and defendant relocated from San Jose to Los Banos, where Doe gave birth to her fourth child S.M. in 2008. Defendant is S.M.'s biological father. While living in Los Banos, defendant commuted to San Jose for his job. Sometimes, he arrived home "really late" because he would drink beer with his colleagues after work, resulting in arguments with Doe. Approximately one year after relocating, Doe and defendant returned to San Jose and moved back in with defendant's parents for a few months. The two eldest children—Doe 2 and B.M.—initially attended public school, but defendant took them out when a staff member informed him that they "were running around with little boys." Thereafter, Doe 2 and B.M. were homeschooled by Doe, who opposed their withdrawal because she did not believe that they had acted inappropriately. In 2010, Doe gave birth to her youngest child G.M. Defendant is G.M.'s biological father.

Doe described her relationship with defendant as "constantly up and down" and "on and off" between 2000 and 2010. He "had his issues with drinking." Although defendant occasionally sobered up whenever Doe threatened to leave him, he would

3.

inevitably "fall back." Defendant controlled the finances and sometimes left home without giving Doe any money for the children's upkeep. Due to his jealousy, he normally refused to let her go to the grocery store. On the rare occasions that Doe was allowed to do so, she would be inundated with questions about her interactions ("did anybody talk to you[?]"; "did you talk to anybody[?]"; "did any guys hit on you[?]").

At some point, Doe and defendant moved to Tracy, where they stayed for over a year. Defendant's habit of "staying up all night drinking" "was the same." Additionally, he frequently invited strangers over to the house to drink, which made Doe uncomfortable because the children were present. Doe and defendant subsequently left Tracy because A.M.—then five years of age—had been molested by one of defendant's acquaintances. Doe blamed defendant for this incident.

In 2014, Doe and defendant moved to Clovis, where the latter's drinking "became very heavy again." He also opposed her wish to go back to school and find a job. Doe told defendant that "[she] just really wasn't happy in the relationship" and "wanted to separate." Thereafter, he "changed" and became "more aggressive." Defendant "started going through [Doe's] phone," "got into [her] face" a few times, and made menacing comments ("you're not going to leave me, and if you think that's going to happen, it's not"; "if [I] can't have [you] th[en] nobody can"; "if you ever think of leaving me, do you know how easy it is for me to do whatever I want and just go to Mexico[?]"). Doe started carrying a small pocketknife because "[the] arguments became so bad," she "was scared," and she "felt like . . . [defendant] could just snap on [her] any time."

On March 19, 2015, Doe and defendant had another argument. Defendant, who "became unglued way more easier," walked away and "made it seem like he was going to go grab something." Doe knew that firearms and knives were in the house and "thought he was going to hurt [her]." She phoned 911 but hung up when defendant reappeared. Doe did not realize that the call went through until police officers arrived. Defendant "grabbed [a] gun," "tucked it in the back of his pants," and ordered Doe to stay inside or

4.

else "he would shoot the police officers, and then he'd come back inside for [her]." He went outside and spoke to the officers, who "bought his story" and left after a few minutes.

Sometime between March 19, 2015, and May 23, 2015, Doe and defendant "got into a really bad argument." Consequently, Doe and Doe 2 left the residence. B.M. called Doe and urged her to come back because defendant threatened "to burn the house down" and "kill [Doe 2's] cat." After Doe returned, she and defendant quarreled again. When she tried to leave, he pinned her against the car. Doe was able to take out and unfold her pocketknife. Defendant "noticed that [she] was trying to get something," "put his hands down," and "sliced himself on his thumb" as "[her] hands [*sic*] was coming up." Doe did not thrust or swing the blade. Defendant's father, who was present, "ran out" and "took [defendant] off of [Doe]."

On the evening of May 23, 2015, Doe was at home with her youngest children when defendant, Doe 2, and B.M. returned from a sports pub, where they had watched mixed martial arts fights aired on pay-per-view. Doe 2 "immediately just went straight to her room" and B.M. remarked, "[M]om, don't ever let us go anywhere with him again by ourselves." Doe asked B.M. what had happened. B.M. stated that she and Doe 2 needed to use the restroom. Defendant, who was drinking with other patrons, "had his back turned towards them" and did not respond when "they kept trying to tap him on the back." When he "realized they were gone," "he flipped out." In addition, defendant yelled at a security guard and almost started a physical altercation.

As B.M. was detailing the episode to Doe, defendant—who appeared intoxicated—"was getting really angry" and "yelling at [B.M.]." He then told Doe that he "thought [she] went and picked [the children] up" from the sports pub and "abandoned [him] there." Defendant "got in [B.M.'s] face." Doe, who "thought he was going to hit her," "got between" the two and implored him to stop. Defendant punched a wall so hard that he created a hole, "slammed his head on the mantle," and entered the kitchen "like he

5.

was going to go grab something or do something." Frightened, Doe dialed 911. When she heard one of her children "yelling out that [defendant] had a gun," she dropped the phone and "got out the front door as fast as [she] could" so that defendant would not shoot her in front of the children.

Outside, as Doe was approaching the driveway, she "felt heat to [her] back" and knew that she had been struck with a bullet. She heard additional gunshots. Doe reached the middle of the street and flagged down a vehicle. When she turned around, defendant was "in [her] face." Doe "grabbed him with both of [her] hands on his face" and "told him to stop because the [children] were watching." She ultimately "blacked out." Before losing consciousness, Doe observed defendant pointing his gun at and threatening the occupants of the vehicle that had stopped.

b. *Testimony of Doe 2*

On May 23, 2015, Doe 2—then 16 years of age—went to a sports bar with defendant and B.M. to watch mixed martial arts fights on television. While defendant was drinking beer and conversing with other patrons, the half-siblings went to the restroom together. They had "tried to let him know that [they] were going to go" but "couldn't get his attention." After Doe 2 and B.M. "opened the door to get out of the restroom," they saw defendant "standing there" angrily. He scolded them for leaving without informing him. The three went back to their table, where defendant continued to lecture them. Later, defendant, Doe 2, and B.M. tried to leave the premises through an emergency exit but were stopped by a security guard and redirected to the main entrance. Defendant struck the guard in the head with a rolled-up poster. Doe 2 "had to push him away" and "started crying because that was embarrassing for [her]."

After defendant, Doe 2, and B.M. returned home, Doe 2 "went straight to [her] room." She overheard defendant, Doe, and B.M. arguing. When Doe 2 "heard one of [her] sisters scream," she "got up to see what was going on." She "saw [B.M.] running outside" and followed her. Doe 2 saw defendant "on all fours" over Doe in the street. He

6.

appeared to be choking her. Both Doe 2 and B.M. tried to get defendant off Doe, but to no avail. He eventually arose, drew closer to Doe 2, and "swung at [her] twice" with a closed fist, striking her mouth the second time. Before driving away from the scene, defendant told several onlookers to leave or else "he would kill them too."

At trial, Doe 2 testified that she had never witnessed Doe acting violent toward defendant.

c. *B.M.*

i. May 27, 2015 MDIC[2] interview

On the evening of May 23, 2015, B.M. and Doe 2 went with defendant to a sports pub to "watch the fights." However, after the two went to the bathroom, he "[got] mad because he said that [they] didn't ask him." When they were about to leave the building through an exit, a security guard informed them that they " 'ha[d] to go to the other side.' " Defendant ignored the guard and tried to pass, but the guard "kind of shoved [him]." Infuriated, defendant hit the guard in the head with a poster and said, " 'You wanna go? You wanna like "effing go?" ' "

After the three came back home, B.M. tried to tell Doe about the pay-per-view, but defendant muttered, " 'You don't even talk about the damn fights right now.' " He went outside and told Doe to accompany him. She obliged. When the pair returned, defendant was still angry. Doe advised him to " 'just forget it' " and " '[not] let the kids go with [him] again.' " Defendant then complained about the security guard. Irritated, Doe replied, " 'Just go away already.' " Defendant went into the kitchen and punched a wall. He also "giggled" "really weird[ly]." Doe grabbed a phone and hurried outside. Defendant pulled a firearm out of his pocket and chased her. B.M. screamed, " 'He has a gun! He has a gun!' "

---

**2**  Multi-Disciplinary Interview Center.

B.M. followed defendant. At least three shots were fired. Doe, who was "still standing up" on the road, raised her right hand and told defendant to stop " 'because [of] the kids.' " He subsequently punched her so hard that she "spun" before landing on the ground. Defendant climbed on top of Doe and started choking her. B.M. believed Doe was already dead and tried to get defendant off of her. Doe 2 emerged from the house and also tried to get him off. Later, defendant stood up and asked a spectator, " 'You want to get shot too?' " He then approached Doe 2, punched her in the face, and drove away.

ii. Trial testimony

B.M.'s trial testimony varied from her MDIC interview in several respects. At the sports pub, defendant was concerned about B.M. and Doe 2 going to the bathroom without telling him because "there were a lot of drunk people" and "something could have happened to [them]." He did not raise his voice. On the way out of the establishment, defendant "tapped" a security guard's head with a poster because he "was not letting [them] pass the gate." He was "more frustrated" than angry. Once the three arrived at the house, B.M. went to her room to change clothes. When she came out, Doe and defendant were already "going back and forth" about what had occurred at the sports pub. B.M. had not discussed the incident with Doe. During the exchange, Doe was "petty" and "mouthy." She told defendant that he "just let[] [the children] w[a]nder off" and "can't even take care of them," which exasperated him. Defendant "was not mad" at B.M. and never "g[o]t in [her] face." Sometime thereafter, he hit his head against the wall. Doe "giggled" and "said she was going to call the police." As she went outside with a phone, defendant took a gun out of his pocket and followed her. B.M. "screamed out that he had a gun" and exited the house. She saw defendant shooting at Doe. At some point, he climbed on top of Doe when she was on the ground. Afterward, defendant either slapped or punched Doe 2.

8.

B.M. testified that, in general, Doe instigated arguments while defendant deescalated them. While Doe was hospitalized following the shooting, she instructed B.M. to "cry" and "be more dramatic" during interviews with law enforcement to "make [defendant] look more bad."

d. *Detective Mosher*

In the wake of the shooting, Detective Mosher of the Clovis Police Department attempted to track down defendant for several months. In late September 2016, he found out that defendant was in police custody in Yuma, Arizona. Shortly thereafter, defendant was extradited to Fresno.

On October 17, 2016, Mosher interviewed defendant. After waiving his *Miranda*[3] rights, defendant recounted the events of May 23, 2015. That evening, an argument with Doe intensified when she "brandished a gun," "grabbed a phone," and "ran out of the house." Defendant "chased her" and "took the gun from her." As he "was trying to wipe his fingerprints off of it," "it accidentally fired." Defendant's "mind went crazy" and he was "convinced that he was going to get in trouble" and "perhaps go to prison" for discharging the weapon. He "was angry at [Doe] because in his mind she got what she wanted." Out of frustration, defendant fired the gun twice "toward the ground." He could not recall punching Doe 2 in the face or threatening onlookers. Defendant fled to Las Vegas. There, he learned for the first time that Doe had been shot.

## II. Defense's case-in-chief

a. *Testimony of defendant*

Defendant and Doe started dating when he was 14 or 15 years old. They initially lived in San Jose, briefly moved to Los Banos, and then returned to San Jose for a two- or three-year period. During the second stint in San Jose, Doe "didn't really get along with" members of defendant's extended family and refused to attend gatherings. Defendant

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

could not go by himself because Doe would threaten to leave him and take the children. Regarding Doe 2 and B.M.'s removal from public school, both defendant and Doe agreed to take them out because "their grades were not that good" and "they were probably hanging out with the wrong people."

Defendant and Doe moved to Tracy for a year. Defendant never invited strangers over "to drink or do anything else." Once, his coworkers came to the house for a birthday party. On another occasion, defendant brought A.M. to a coworker's residence so that they could look at roosters. At some point, while defendant was fixated on the animals, the coworker touched A.M.'s "private area." Thereafter, whenever defendant and Doe would argue, she would "constantly" "bring up this incident" and "throw it in [his] face."

In 2014 or 2015, defendant and Doe moved to Clovis, where the relationship continued to deteriorate. He "wasn't doing anything right in her eyes." Their arguments occurred "a few times a week" and were "always loud." Sometimes, Doe would "up and leave" for San Jose for a few days and not answer phone calls. During this time, defendant's drinking worsened.

About two weeks before the May 23, 2015 shooting, while defendant's extended family was visiting, defendant went outside and saw Doe putting a bag in the car. She told him that she was "taking off again" and was "going to take the kids." When defendant asked for the car keys, Doe swung a folding knife at him, cutting his thumb Defendant's father, who had come out to check on him, witnessed the attack.

Approximately five or six months after relocating to Clovis, defendant purchased a firearm for Doe, who wanted it because "she heard noises around the house" whenever he was absent. A few days before the May 23, 2015 shooting, in the middle of an argument, Doe cocked the gun and pointed it at defendant, her feet, her head, and defendant again.

On the evening of May 23, 2015, defendant, Doe 2, and B.M. went to a sports pub to watch mixed martial arts fights on television. There, he drank alcohol "for about four

10.

hours." At some point, defendant noticed that the children were gone and panicked. He searched the facility and eventually found Doe 2 and B.M., who claimed that they had used the restroom. Defendant told them to let him know about their whereabouts next time. He did not yell. Later, when the three tried to leave through a side exit, a security guard closed the door and said they "c[ould]n't go through here." Defendant "tapped" the guard's head with a poster. At home, he spoke to Doe about "what had happened with the kids." She accused him of "not being able to take care of [them]." Defendant remarked, "[W]hy is this such a big deal? I was just trying to take care of my kids." Doe responded, "[Y]es, like the way you took care of [A.M.]" This statement angered defendant, who punched a hole in a wall and bumped his head "on the doorway." He then saw Doe going out the front door with a gun and a phone. The next thing defendant recalled was "looking at the gun in the street," "going towards [his] car," and fleeing the scene. He did not remember shooting Doe, punching or choking Doe, punching Doe 2, or threatening bystanders.

Defendant drove to Las Vegas, where he rested for "three and a half, four days." He then learned from a cousin that Doe "was in the hospital" "from her being shot." Alarmed, defendant went to Mexico, where he hid for "over a year."

b. *Testimony of defendant's father*

Two weeks before the May 23, 2015 shooting, defendant's father was at defendant and Doe's home in Clovis watching television when he heard a commotion outside. He exited the house and saw Doe yelling at defendant and swinging a knife. When defendant tried to confiscate the blade, he cut his finger.

c. *A.M.*

A.M. testified that—on the evening of May 23, 2015—defendant and Doe were fighting, defendant punched and hit his head against the wall, and Doe picked up a phone to call 911.

11.

The parties stipulated that A.M. participated in an MDIC interview when she was eight years old. She stated that Doe "usually starts the fights" and defendant "calms her down." Immediately preceding the shooting, defendant "kind of changed after he hit his head."

d. *S.M.*

S.M. testified that—on the evening of May 23, 2015—defendant and Doe were arguing and defendant hit his head against the wall.

The parties stipulated that S.M. participated in an MDIC interview when she was six years old. She stated that—prior to the shooting—Doe had been "talking back" to defendant and asked him, "[W]hy don't you take care of your kids[?]"

## DISCUSSION

I. **Evidence of the victim's character**

a. *Background*

In an in limine motion, the prosecution requested a hearing pursuant to Evidence Code section 402 "on the foundation, relevancy and admissibility of any character evidence of defense witnesses." (Boldface, capitalization & underlining omitted.) The request was granted.

At the hearing, B.M. testified that she witnessed Doe acting violent toward defendant on multiple occasions. One time, "a few years" before the May 23, 2015 shooting and before the family moved to Tracy, Doe lunged at defendant with a knife in the middle of a verbal altercation. He seized the weapon from her but "didn't hit her, or slap her, or pull her hair, or choke her or nothing." B.M. remembered that defendant "had blood on his stomach and his arm." Another time, during a Thanksgiving gathering six or seven years earlier, a pregnant Doe flung a plate of hot food at defendant's face. Finally, approximately two years before the shooting and when the family was living in Tracy, Doe punched walls and a mirror before striking defendant's head repeatedly when he tried to placate her. Prior to the shooting, B.M. had never witnessed defendant acting

12.

violent toward Doe. The defense contended that Doe "was violent towards [defendant]" and the three aforementioned incidents "show[ed] a pattern of [her violent] behavior over time" that "create[d]" "a build up of emotions that led to [defendant's] snap at the end."

Ultimately, the court decided to exclude the three incidents. It reasoned:

"The issue, at least so far, had been three alleged prior instances of conduct; one involving throwing hot food on the defendant by the alleged victim and . . . another an allegation that the victim's [*sic*] first punched the mirror cutting her hands and then punched the defendant multiple times in the head, and then the third would be an instan[ce] alleged that the alleged victim while in the kitchen charged at the defendant with the knife and actually inflicted at least some sort of injury that resulted in the bleeding in the abdomen area, I believe. All of those events occurred a significant period of time prior to the alleged shooting in this case. I believe the witness, my question to her was whether I was correct that the most recent one would be at least two years prior to the shooting and that was confirmed by the witness yesterday.

"So first under [Evidence Code section] 1103, what we're talking about is the victim's alleged character trait for violence. As stated on the record yesterday this is not a self-defense claim. This will involve a claim of heat of passion and provocation. There has been no evidence so far that the defendant was provoked on this particular occasion by an act of violence by the victim. So the testimony so far, at least that the Court has been able to identify, would only, at least at this point, support an inference that the defendant was provoked by the victim's alleged statements to the defendant that he did not take care of his children, that more specific[ally] came in through the witness [B.M.] yesterday, but the Court has allowed both sides to question witnesses regarding history of arguing and specifically the issue of prior abuse of one of the children and an allegation that the victim blamed the defendant. The only prior instance of violence that the Court has allowed either side to inquire into has been the incident several weeks prior to the shooting where the alleged victim testified to where she claimed she was trying to take out a knife to protect herself and the defendant allegedly was trying to grab that knife and cut this thumb. That was allowed in under [Evidence Code section] 1109. The Court has also been allowing the defense to reference that as far as provocation and heat of passion. [¶] . . . [¶]

"Under a[n Evidence Code section] 352 analysis, the prior . . . violent conduct of the victim is disputed. The alleged victim is claiming

13.

that it didn't happen and the defense is claiming that it did. Any alleged conduct other than the [Evidence Code section] 1109 evidence previously referenced would be multiple years old from the date of the shooting. The Court believes that would provide minimum probative value and relevance, and given what I already mentioned under [Evidence Code section] 1103, it would result in an undue consumption of time, and the Court also believes it would be highly prejudicial, since the Court believes that the alleged violent conduct of the victim is not actually at issue since that wasn't . . . what would have provoked the defendant or resulted in an act of a heat of passion."

b. *Analysis*

"Attempted murder requires the intent to kill and a direct but ineffectual act toward accomplishing the intended killing." (*People v. Juarez* (2016) 62 Cal.4th 1164, 1170.) "Where a person intends to kill another person and makes an unsuccessful attempt to do so, his intention may be accompanied by any of the aggravating or mitigating circumstances which can accompany the completed crimes. In other words, the intent to kill may have been formed after premeditation or deliberation, it may have been formed upon a sudden explosion of violence, or it may have been brought about by a heat of passion or an unreasonable but good faith belief in the necessity of self-defense." (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824; see CALCRIM No. 603 ["An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion."].)

"The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) " '[N]o defendant may set up his own standard of conduct and justify or excuse himself

because in fact his passions were aroused, unless . . . the jury believe[s] that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.) " ' "[N]o specific type of provocation [is] required . . . ." ' [Citation.] Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]. 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the [attempted] killing is not [attempted] voluntary manslaughter . . . .' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 163; see *People v. Gingell* (1931) 211 Cal. 532, 545 ["[T]he 'cooling time' to be considered [i]s the time within which an ordinarily reasonable man would cool under like circumstances."].)

"Evidence Code section 1101, subdivision (a) provides that 'evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion.' Evidence Code section 1103, subdivision (a)(1) provides an exception to Evidence Code section 1101, subdivision (a) when a defendant offers evidence regarding the character or trait of a victim 'to prove conduct of the victim in conformity with the character or trait of character.' Of course, the trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative. [Citations.] The trial court must always perform its gatekeeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828.) " 'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Here, the defense argued that the shooting transpired because defendant had been provoked by Doe's violent behavior and sought to admit three prior incidents to prove that her conduct was "in conformity with" her aggressive character. (Evid. Code, § 1101, subd. (a).) However, the record does not support that Doe was violent and/or aggressive on the night in question. At most, testimonies in favor of the defense showed that she chided defendant for not properly supervising Doe 2 and B.M. at the sports pub and reminded him about A.M.'s molestation that occurred under his watch. (Cf. *People v. Hoyos* (2007) 41 Cal.4th 872, 913 ["[E]ven if the murder victim were the most violent person in the world, that fact would not be relevant if the evidence made it clear that the victim was taken by surprise and shot in the back of the head."], overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Therefore, the court properly exercised its discretion to exclude evidence pertaining to Doe's alleged propensity for violence and we will not disturb its ruling.

## DISPOSITION

The judgment is affirmed.

DETJEN, J.

WE CONCUR:

HILL, P. J.

POOCHIGIAN, J.

16.